UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

JOCELYNE NEGRON,

                         Plaintiff,

              -against-

ANDREW M. SAUL,
Commissioner of Social Security,

                         Defendant.
-------------------------------------------------------------X

**REPORT AND
RECOMMENDATION**

19 Civ. 07547 (KMK)(JCM)

To the Honorable Kenneth M. Karas, United States District Judge:

      Plaintiff Jocelyne Negron ("Plaintiff") commenced this action pursuant to 42 U.S.C. §

405(g), challenging the decision of the Commissioner of Social Security (the "Commissioner"),

which denied Plaintiff's application for disability insurance benefits and supplemental security

income ("SSI"), finding her not disabled within the meaning of the Social Security Act (the

"Act"). (Docket No. 1).  Presently before this Court are (1) Plaintiff's motion for judgment on

the pleadings pursuant to Federal Rule of Civil Procedure 12(c), (Docket No. 13), and (2) the

Commissioner's cross-motion for judgment on the pleadings, (Docket No. 21).  For the reasons

set forth herein, the Court respectfully recommends denying Plaintiff's motion for judgment on

the pleadings and granting the Commissioner's cross-motion.

## I.  BACKGROUND

      Plaintiff was born on April 26, 1970. (R.[1] 283).  On July 28, 2016, Plaintiff applied for

disability insurance benefits, alleging that she was disabled beginning January 1, 2016. (R. 21,

---

[1] Refers to the certified administrative record of proceedings relating to Plaintiff's application for social security
benefits, filed in this action on January 31, 2020. (Docket No. 12).  All page number citations to the certified
administrative record refer to the page number assigned by the SSA.

111).[2]  In filing the pending motion, Plaintiff amended her alleged onset date to the date her

application for benefits was filed, July 28, 2016. (Docket No. 14 at 5).  The Social Security

Administration ("SSA") denied Plaintiff's claim on September 30, 2019 and Plaintiff requested a

hearing before an administrative law judge ("ALJ"). (R. 21, 135-36).  Plaintiff appeared before

ALJ Elias Feuer on July 24, 2018. (R. 21).  On October 16, 2018, the ALJ issued a decision

finding that Plaintiff was not disabled and therefore not entitled to disability insurance benefits.

(R. 21-34).  The Appeals Council subsequently denied Plaintiff's request for review on June 17,

2019, and the decision of the ALJ became the Commissioner's final decision. (R. 1-14).

## A.  Medical Evidence

## 1.  Medical Evidence Relating to Plaintiff's Physical Conditions

Plaintiff was treated by Dr. Jaime F. Lopez-Santini at Settlement Health Center

("Settlement Health") from 2007 through June 2018. (R. 287, 700).

## i.  Before the Alleged Disability Onset Date

As early as 2009, Dr. Lopez-Santini referred Plaintiff to Mount Sinai Radiology

Associates ("MSRA") for analysis of her back and lungs. (R. 444).  On February 10, 2009, Dr.

Rhona J. Keller of MSRA noted "minimal degenerative changes" within Plaintiff's spine. (*Id.*).

Dr. Keller advised that Plaintiff's lumbosacral spine showed slightly exaggerated lumbar lordosis

with a horizontal sacrum. (*Id.*).  She also detected minimal narrowing of the intervertebral disk

spaces in the more proximal spine, with small peripheral osteophytes, and slightly irregular

sclerosis on the left iliac crest. (*Id.*).  On May 12, 2011, an MRI of Plaintiff's lumbar spine

showed disc herniation, radiculopathy and low back pain syndrome. (R. 445).  Dr. Satish

---

[2] Plaintiff was previously denied disability insurance benefits twice, on April 17, 2012 and December 18, 2015. (R. 66-108, 272).

Chandra, a radiologist, noted fluid in facet joints bilaterally, suggesting acute inflammation, and disc bulges in two areas. (*Id.*).  On October 9, 2013, an x-ray examination of Plaintiff's chest and lungs was unremarkable, indicating no effusion of the lungs. (R. 448).

On January 1, 2016, Plaintiff visited Dr. Lopez-Santini for a follow-up after bariatric surgery, reporting that she felt "well." (R. 440-41, 732-33).[3]  An examination revealed a Body Mass Index ("BMI") of 31.97 with a weight change of 14.60 pounds since September 11, 2015. (R. 440, 732).  Plaintiff's lungs were clear and she exhibited full range of motion in all joints. (R. 441).  Dr. Lopez noted that Plaintiff's hypertension had improved and "bec[o]me controlled after weight loss" from the surgery. (*Id.*).  Plaintiff's insomnia had improved as well. (R. 442).

On March 29, 2016, Plaintiff had another follow up with Dr. Lopez-Santini. (R. 436, 728).  Plaintiff's BMI had risen to 34.67 and it was noted that she was obese. (*Id.*).  Plaintiff reported "feel[ing] stable" and that she was taking her medications as prescribed and "eating better." (R. 436-37, 728).  Plaintiff wanted to lose fifteen to twenty pounds. (R. 437, 731).  On examination, she appeared overweight and her lungs were clear to auscultation bilaterally, without rales, rhonchi or wheezes. (R. 438).  Dr. Lopez-Santini assessed mild, intermittent asthma as well as "low back pain syndrome," noting that neither condition had changed since prior appointments and that Plaintiff should continue with her medications, including Ventolin, zolpidem tartrate, albuterol sulfate and Percocet. (R. 438-39, 729).

On May 17, 2016, Plaintiff reported "no problems" and "feel[ing] well." (R. 433, 726).  An examination again revealed obesity, a BMI of 34.49, clear lungs and no abnormalities. (R. 433-34, 726-27).  When Plaintiff returned on July 8, 2016, Plaintiff's BMI was lower, at 33.78,

---

[3] Although many treatment notes appear more than once in the record, some duplicative versions are missing pages.

but still indicated obesity. (R. 429, 722).  The results of the examination were otherwise
unchanged. (R. 429-32, 723-24).

### ii.  After the Alleged Disability Onset Date

Plaintiff visited Dr. Lopez again on September 28, 2016 and March 7, 2017, continuing
to report feeling well and demonstrating no abnormalities except being overweight and/or obese.
(R. 423-28, 716-21).  An examination on June 21, 2017 revealed that Plaintiff had gained
additional weight and ate a lot during the day, but Plaintiff otherwise felt stable. (R. 420, 713).
Plaintiff's gait and station were normal. (R. 421, 714).  Dr. Lopez-Santini also assessed her
asthma as stable. (*Id.*).

On October 17, 2017, Plaintiff complained of right knee and back pain, though denied
any knee trauma. (R. 711).  Plaintiff was still overweight but in no acute distress. (*Id.*).  Dr.
Lopez-Santini observed a full range of motion and no cysts. (*Id.*).  The examination was
otherwise normal. (*Id.*).  Dr. Lopez-Santini ordered an MRI of Plaintiff's right knee and
prescribed Endocet as well as a back brace for use "as directed." (R. 711-12).

Plaintiff received the same obesity diagnosis at an annual gynecological appointment on
January 17, 2018. (R. 704).  On March 6, 2018, Plaintiff returned to Dr. Lopez-Santini for a
follow-up visit, feeling well except for a bothersome hernia and reporting that she had lost some
weight. (R. 700-01).  Plaintiff was still described as obese, but upon examination, demonstrated
no abnormalities except for the hernia. (R. 700).  Neither Plaintiff nor Dr. Lopez-Santini
mentioned Plaintiff's knee or back pain. (R. 700-01).

### 2.  Medical Evidence Relating to Plaintiff's Psychiatric Conditions

Plaintiff was treated by various psychiatric staff and social workers at Saint Barnabas
Hospital Behavioral Health Services ("SBH") from 2012 to May 2018. (R. 288, 691, 741).

### i. Before the Alleged Disability Onset Date

On April 7, 2014, Plaintiff had an intake appointment with Master of Social Work ("MSW") Maria Daidone and Supervised Experience Licensed Clinical Social Worker ("LCSW-R") Betty Navedo Barsa. (R. 368-74).  Plaintiff's chief complaint was "depression," noting that for the past ten years, she had mood swings, anxiety, and poor sleep, and sometimes heard voices calling her, saw shadows, and thought people followed her. (R. 368).  Plaintiff threw herself down a set of stairs in 1986, and had a history of heroin and cocaine abuse. (R. 368-71).  Plaintiff had attended a methadone program since 2007, and had been free from heroin for seven years and cocaine for one year. (R. 371-72).  Plaintiff further explained that she immigrated to the United States from Puerto Rico when she was twenty-five, and now lived with her son and partner. (R. 369).[4]  She reported having few friends. (*Id.*).  Plaintiff was listed as being unable to speak and understand English, yet not in need of language assistance. (R. 368).[5]

On examination, Plaintiff was alert, oriented and cooperative, with clear and goal-directed speech as well as "go[o]d and productive thought processes." (R. 372).  The team diagnosed depressive disorder, assigned a GAF score of 60,[6] and noted that Plaintiff had "marked" difficulties in social functioning with "mild" symptoms of depression and psychosis. (R. 372-74).  However, they did not find extended impairment in functioning given that she had

---

[4] In some records, Plaintiff described the man she lived with as her "husband," (*e.g.*, *Id.*), but testified that they were not married, (R. 43), and in other records, she referred to him as her "partner," (R. 407).  For accuracy, the Court will refer to him as her "partner" even when referencing records that describe him as her "husband."

[5] It was also noted at a number of appointments that Plaintiff communicated with her providers in English. (*E.g.*, R. 342, 344, 346, 349, 354, 359).

[6] Plaintiff's GAF score fluctuated both before and after the relevant period, dipping as low as 50 on March 5 and May 8, 2015, (R. 327, 338), rising to 60 on July 13, 2015, (R. 360), and decreasing to 55 on January 6, 2017, (R. 491, 597, 798).

no "marked" difficulties in self-care or daily living, no frequent concentration deficiencies, and no intermittent or continuous GAF score of 50 or less over the past year. (R. 373-74).

Plaintiff was evaluated by Dr. Colette Bruni, MSW Daidone and LCSW-R Brian Marren on May 8, 2014. (R. 337).  In addition to depressive disorder, they diagnosed borderline personality disorder, cocaine dependence and abuse, opioid dependence on maintenance agonist therapy and nicotine dependence. (R. 337-38).  They also devised a set of treatment goals and objectives to manage Plaintiff's anger, depression, insomnia, auditory hallucinations and paranoia, which they described as "severe." (R. 339-40).

Plaintiff saw Dr. Bruni again on June 23, 2014. (R. 380-83, 590-93).  Plaintiff noted that she smoked a pack of cigarettes daily for her nerves. (R. 380, 590).  According to Plaintiff, she finished up to the ninth grade in Puerto Rico and had no work history. (*Id.*).  A suicide and self-harm assessment was negative, and on further examination, Plaintiff exhibited a neutral mood and full affect with an appropriate range. (R. 381, 591).  Plaintiff did not demonstrate psychotic symptoms, delusions or thought disorder. (*Id.*).  Dr. Bruni also found Plaintiff's thought process organized, her memory intact and her speech clear and coherent, but her judgment poor and her insight impaired. (*Id.*).  Dr. Bruni advised Plaintiff to continue taking the medications prescribed at her previous health clinic, including Seroquel, buspirone and Geodon, and lowered her dosage of Celexa. (R. 382-83, 592-93).

At a follow-up with Dr. Bruni on November 17, 2014, Plaintiff was pleasant, with a happy mood and full affect. (R. 365-66, 564-65).  Plaintiff reported "doing well," as her medications did not cause side effects and helped her function as well as care for her son. (R. 367, 565).  She had no mania, hypomania, depression or anxiety, and her appetite and sleep had improved. (*Id.*).  Dr. Bruni added bipolar disorder to Plaintiff's diagnoses. (R. 366, 565).

Plaintiff's anxiety fluctuated intermittently over the next several months, often coinciding with health or family issues, such as her partner's pulmonary emphysema, her son's asthma, her own medical procedures, or running out of Seroquel.[7]   At a visit with Dr. Bruni, MSW Daidone and LCSW-R Marren on December 5, 2014, although Plaintiff "appeared a little agitated," the team opined that the severity of Plaintiff's anger, depression, insomnia, auditory hallucinations and paranoia had decreased from "10" to "6." (*Compare* R. 339 *with* R. 331).   On January 16, 2015, Dr. Bruni educated Plaintiff regarding potential metabolic side effects from Geodon and Seroquel, but Plaintiff decided to continue taking them. (R. 365, 562).   On May 13, 2015, Dr. Bruni opined that Plaintiff continued benefiting from the medications, sleeping consistently and maintaining a good appetite with a stable mood and no mania or hypomania. (R. 363).

At a further appointment on July 13, 2015, Plaintiff reported less anxiety as well as "good" functioning, telling Dr. Bruni that she was "doing well with the meds." (R. 360). Plaintiff exhibited a pleasant mood, full affect, intact memory, good judgment and good insight. (*Id.*).   Plaintiff exhibited the same mental status on September 5, 2015, except that her insight was normal and her judgment was fair. (R. 356-57, 642-43).

Plaintiff's reported a deteriorated mood at her first therapy session on November 13, 2015 with Licensed Clinical Social Worker ("LCSW") Rudyard Maza. (R. 375, 585).   Plaintiff reported feeling very anxious for the prior few years, as well as moodiness with angry outbursts, impatience and irritability. (R. 375, 585).   In addition, she experienced sleep problems, panic attacks, hyperventilation, a general inability to control her feelings and depression that required hospitalization in 2011. (R. 375-76, 378, 585-86, 588).   LCSW Maza found Plaintiff normal-appearing, with a depressed and anxious mood and constricted affect, but normal insight, good

---

[7] (R. 327, 331, 362-63).

impulse control and fair judgment, as well as intact recent and remote memory skills, attention and concentration. (R. 375, 585).  He also detected low socialization and issues with primary support. (R. 378, 588).  At a follow-up on December 11, 2015, he opined that Plaintiff was currently dealing with anxiety and sleeping difficulties at a severity of "7," (R. 323, 680, 829), and "severe symptoms of depression" at a severity of "5," (R. 324, 681, 829).

On February 22, 2016, Plaintiff complained that she was "feeling more nervous," though "[did not] know why." (R. 349, 393, 521, 635, 825).  However, she denied any increase in depression, noting that she continued to eat and sleep well and that her daily level of functioning had not changed. (*Id.*).  Dr. Bruni opined that Plaintiff appeared normal albeit obese, with no noteworthy changes on examination except that Plaintiff's impulse control and judgment had improved from "fair" to "good." (R. 349, 393, 521, 635, 826).  Dr. Bruni increased Plaintiff's BuSpar dosage. (R. 351, 395, 523, 636, 827).

On April 22, 2016, Plaintiff visited Dr. Nkiruka Iloh, another psychiatrist. (R. 346-48, 396-98, 514-17, 820-22).  Plaintiff reported "feeling better with taking her medication," and denied any problems. (R. 346-47, 396, 515, 632, 820).  On examination, Dr. Iloh found Plaintiff unchanged from her February 22 visit with Dr. Bruni. (R. 347, 352, 396, 515, 633, 820-21).[8]

When Plaintiff returned to LCSW Maza on June 10, 2016, she reported depressive symptoms and anxiety, but that "as long as she t[ook] her medications she fe[lt] stable" and that her treatment had been "beneficial." (R. 314-15, 384, 511, 673-74, 817).  LCSW Maza opined that "some progress ha[d] been attained . . . in dealing with depression and anxiety." (R. 314,

---

[8] Plaintiff visited Dr. Iloh again on June 13 and August 15, 2016, continuing to report stability because of her medications, and presenting normally on examination with "good" impulse control and judgment, intact attention, memory and concentration, and "normal" insight. (R. 342-46, 399-404, 505-10, 556-58, 628-32, 811-16).

384, 511, 673, 817).[9]  At another visit on July 21, 2016, Plaintiff reported "feeling better" and "less panic attacks lately," even though her son had been shot. (R. 558-59). Plaintiff's appetite and sleeping patterns fluctuated, but she continued to deny hallucinations. (*Id.*).

### ii. After the Alleged Disability Onset Date

After the alleged disability onset date, Plaintiff continued to struggle with an anxious mood but consistently reported improvement upon tweaks to her medication regimen and continued therapy despite ongoing family stressors.  At a visit on October 14, 2016 with another psychiatrist, Dr. Marina Cozort, Plaintiff exhibited an anxious mood but otherwise presented as normal and reported good sleep. (R. 499-500, 553-54, 625-26, 806-07).  Dr. Cozort opined that the combined effect of Plaintiff's psychiatric medications was possibly contributing to her anxiety, and could also cause a serotonergic reaction. (R. 501, 555, 627, 807).  Plaintiff agreed to reduce the dosages of her Celexa and BuSpar, but refused to reduce her intake of Seroquel or Geodon. (*Id.*).  At a follow-up on December 15, 2016, Plaintiff reported that she was "doing better," experiencing less heart palpitations. (R. 492, 551, 623, 799).

In spite of these improvements, at an annual assessment with LCSW Maza on January 6, 2017, Plaintiff reported that her anxiety, depression and mood swings had not changed significantly over the past year. (R. 487-88, 594, 795).  A mental status examination revealed a depressed and anxious mood, fair impulse control and judgment, and no other abnormalities. (*Id.*).  On February 14, 2017, Plaintiff told Dr. Cozort, "I am doing well[,] I sleep good[,] I am not depressed." (R. 485, 620, 792).  Plaintiff reported a good mood and consistent sleep, the only

---

[9] LCSW Maza made similar observations on September 9, 2016, (R. 502, 669, 809), November 30, 2016, (R. 494-99, 664-68, 801-05), February 24, 2017, (R. 480-84, 661-64, 788-92), August 4, 2017 (R. 465-69, 653-56, 775-79), and October 27, 2017, (R. 452-56, 649-52, 762-66).

concern being that she had tried to stop taking Seroquel but experienced withdrawal symptoms. (R. 485, 620-21, 792).

At a visit with LCSW Maza on March 11, 2017, Plaintiff presented dysthymic with a mildly anxious and frustrated affect, reporting depressive feelings and severe anxiety because her social security benefits had not been approved yet. (R. 549).  According to Plaintiff, she had been "unable to work for many years due to her mental health condition." (*Id.*).  She was also frustrated with the way in which her son's school handled his ADHD. (*Id.*).

At an appointment with Dr. Cozort on April 11, 2017, Plaintiff complained of "bouts of anxiety" but was described as "coping well." (R. 478, 546, 618, 786).  Plaintiff's asthma was "acting out" and she had gained five pounds, but she refused to reduce her intake of Seroquel. (*Id.*).  Although Plaintiff displayed an anxious mood, the rest of her mental status examination was unchanged except that Plaintiff's judgment improved to "good," and Dr. Cozort opined that she was "stable." (R. 478-80, 547-48, 621-22, 787-88).  Similarly, at her session with LCSW Maza on June 2, 2017, Plaintiff presented with a euthymic mood and full affect, stating that she had been "feeling better lately," and "feel[ing] stable" as long as she took her medications and attended therapy. (R. 544).  Plaintiff reported decreased symptoms, including mood swings, and "appeared to be at baseline." (*Id.*).

On June 14, 2017, Plaintiff told Dr. Cozort that she had stopped taking Celexa because she believed it caused heart palpitations, confusion and memory problems. (R. 470, 542, 615-16, 780).  At an appointment with LCSW Maza on June 23, 2017, Plaintiff reported less panic attacks, though she continued to worry about her partner's pulmonary issues and her son's ADHD. (R. 540).  On August 4, 2017, Plaintiff was dysthymic with a constricted and depressed affect, as well as depressed and anxious as a result of an argument with her daughter, and she

reported fluctuating sleeping patterns and appetite. (R. 538).  Plaintiff described the same

argument to Dr. Cozort and Dr. Gangaiah Kanakamedala on August 11, 2017, stating that she

had been sad and anxious since the incident, and that she continued to worry about her partner's

condition and her back pain. (R. 463, 535, 612, 773).  However, Plaintiff reported "doing well"

on her current medications, a good appetite, and that she was able to sleep six to seven hours per

night. (R. 463-65, 535-37, 612-15, 773-75).  Dr. Cozort opined that although Plaintiff appeared

anxious, talkative and dramatic, she "present[ed] with psychosocial stressors that may

contribute[] to her symptoms." (*Id.*).

Dr. Cozort reiterated this point after a follow-up on September 8, 2017, when Plaintiff

complained of asthma and continued stressors related to her partner and son's health. (R. 460-62,

532-34, 609-11, 770-72).[10]  Dr. Cozort decreased Plaintiff's BuSpar dosage and prescribed

Depakote, in addition to educating Plaintiff on sleep hygiene. (R. 462, 534, 612, 772).

By October 6, 2017, however, Plaintiff reported "doing much better," as the Depakote

"resolved" her mood swings and anxiety and allowed her to "cop[e] well" with her family

stressors. (R. 457, 527, 607, 767).  Dr. Cozort reported "NO acute distress." (*Id.*).  The next

month, on November 3, 2017, Dr. Cozort opined that Plaintiff was "stable," (R. 451, 526, 606),

and on December 1, 2017, observed that Plaintiff was "calm and cooperative" and that her

anxiety and sleep had improved, having experienced only two panic attacks in the prior month,

(R. 602, 757).  Dr. Cozort also noted that Plaintiff's asthma may be yet another contributor to her

anxiety. (*Id.*).  Likewise, on January 12, 2018, LCSW Maza opined that the severity of her

anxiety and sleeping difficulties had decreased from "7" to "6," and that the severity of her

depressive symptoms decreased from "5" to "4." (R. 645-47, 755-56).  That same day, despite

---

[10] Plaintiff referenced the same concerns to LCSW Maza on September 15, 2017. (R. 530).  Plaintiff explained that her husband's diabetes may require amputating his legs. (*Id.*).

"mild" insomnia, shortness of breath and a five-pound weight gain, Plaintiff expressed a good mood and agreed to reduce her Seroquel intake. (R. 599-601, 750-53).

On April 20, 2018, Plaintiff was "calm and pleasant," even though she had run out of Depakote and continued to feel the stress of her partner's illness. (R. 688, 744). Plaintiff told Dr. Cozort that she had reduced her cigarette smoking. (*Id.*). Dr. Cozort opined that she was "coping well" with her stressors. (R. 688-90, 744-46). Similarly, on May 18, 2018, Plaintiff reported "doing better" despite bouts of anxiety, with improved sleep. (R. 691, 741). Plaintiff had lost about five pounds, no longer experienced shortness of breath, and "looked much better." (*Id.*). Dr. Cozort noted an improvement in Plaintiff's impulse control from "fair" to "good," and prescribed Vistaril "as needed." (R. 692-93, 742-43).

## B. Opinion Evidence

## 1. Opinions from Consulting Physicians

## i. Opinions Regarding Plaintiff's Physical Impairments

## (a) Cheryl Archbald, M.D.'s September 22, 2016 Opinion

Dr. Cheryl Archbald performed an internal medicine examination on September 22, 2016. (R. 409). Plaintiff's chief complaint was occasional pain in her mid and lower back with a severity of 8/10 that had been occurring for the past three to four years. (*Id.*). She previously was told that she had a disk problem as well as a back infection. (*Id.*). Plaintiff explained that the pain was triggered by bending or mopping underneath a chair, but she treated the pain with medication. (*Id.*). She was also diagnosed with bipolar disorder, depression, anxiety and sleeping problems when she was twenty-two. (*Id.*). At twenty-five, she was diagnosed with asthma, though had never been hospitalized due to asthma. (*Id.*). According to Plaintiff, her asthma was triggered by cigarette smoke and heat. (*Id.*). Plaintiff stated that she had smoked cigarettes since she was twelve. (*Id.*). She also reported a history of cocaine and heroin use.

12

(*Id.*).  Plaintiff advised that she was in a methadone treatment program and lived with her partner and a friend. (*Id.*).  Plaintiff stated that she could cook, clean, do laundry and shop, as well as shower, bathe and dress herself. (R. 410).  She spent time watching television and attending the methadone program. (*Id.*).

A physical examination showed that Plaintiff was 5'3" and 194 pounds. (*Id.*).  Her vision was 20/30 in her right eye and 20/40 in her left eye, with 20/30 for both eyes on a Snellen chart at twenty feet, corrected. (*Id.*).  Plaintiff was not in acute distress and her gait was normal, but she deferred walking on her heels and toes and had only half of a squat. (*Id.*).  Plaintiff's stance was also normal. (*Id.*).  Plaintiff did not use any assistive devices, did not need help changing for her exam, and was able to rise from her chair without difficulty. (*Id.*).  An examination of Plaintiff's chest and lungs, heart, musculoskeletal system, extremities and hands was normal. (*Id.*).  Plaintiff's lumbosacral spine showed a full range of motion upon extension and flexion at sixty degrees, as well as full range of motion on lateral flexion bilaterally. (*Id.*).  She was able to rotate twenty degrees laterally on the right, and presented a full range of motion on the left. (*Id.*).  A straight leg raise test was negative bilaterally, sitting and supine. (*Id.*).  Plaintiff's cervical spine demonstrated full range of motion of flexion, extension, lateral rotation and lateral flexion bilaterally. (*Id.*).  An x-ray of Plaintiff's lumbosacral, AP and lateral spine showed degenerative changes. (R. 411, 413).

Dr. Archbald diagnosed bipolar disorder, depression, anxiety, sleeping problems, back pain, asthma and decreased visual acuity. (R. 411).  In a medical source statement, she opined that Plaintiff should avoid environmental triggers for her asthma and limit activities involving fine visual acuity. (*Id.*).  Dr. Archbald further concluded that Plaintiff had mild limitations in squatting and moderate limitations in bending. (*Id.*).

**(b) Cheryl Archbald, M.D.'s November 16, 2017 Opinion**

Dr. Archbald performed another physical examination on November 16, 2017. (R. 574). Plaintiff continued to complain of back pain. (*Id.*). In addition to bending, the pain was now triggered by prolonged sitting. (*Id.*). According to Plaintiff, her pain ranged from a 3/10 to a 10/10, though pain medications helped. (*Id.*). Plaintiff reported that her primary care provider planned to refer her to a back specialist. (*Id.*). Plaintiff again noted a history of asthma, triggered by weather changes such as rain. (*Id.*). Plaintiff continued to smoke a pack of cigarettes per day and lived with her ten-year-old son and partner. (*Id.*). Plaintiff cooked, cleaned, shopped, showered and dressed herself. (R. 575). However, her partner handled the laundry. (*Id.*). Her activities included watching television, socializing with friends and attending her methadone program. (*Id.*).

The physical examination revealed that Plaintiff was 6'4"[11] and 194 pounds, with 20/25 vision on the right side, 20/25 vision on the left side, and 20/25 vision on both sides on a Snellen chart at twenty feet, corrected. (*Id.*). Her gait and stance were normal, and this time, she could walk on her heels and toes without difficulty. (*Id.*). Plaintiff still did not use an assistive device and was able to change, get on and off of the examination table, and rise from her chair on her own, but had a three-quarter squat with a complaint of knee pain. (*Id.*). A musculoskeletal examination revealed full flexion, extension, lateral flexion and rotary movement bilaterally in her cervical and lumbar spine. (*Id.*). A supine bilateral straight leg raise test was negative. (R. 576). However, when sitting, another straight leg raise test was fifty degrees on the right due to right knee pain. (*Id.*). Similarly, Plaintiff could only extend and flex her right hip eighty degrees,

---

[11] This measurement appears to be a typographical error, as Plaintiff measured 5'3" at her prior physical examination with Dr. Archbald. (R. 410).

and her right knee 120 degrees with right knee pain. (*Id.*).  Dr. Archbald also detected mild pain of the right medial knee with mild effusion, as well as bilateral knee crepitus. (*Id.*).

Dr. Archbald diagnosed right knee pain, a history of back pain, bipolar disorder, anxiety attacks, a history of opioid dependence and asthma. (*Id.*).  In a medical source statement, she opined that Plaintiff should continue avoiding environmental triggers for her asthma. (R. 576, 582).  Dr. Archbald further opined that Plaintiff had mild limitations for squatting, kneeling on her right knee and climbing stairs, could participate in all activities of daily living, and could only stand and walk for two hours each in an eight hour workday. (R. 576, 579-83).  However, she did not indicate any visual impairments or limitations stemming therefrom. (R. 581, 583).

## ii. Opinions Regarding Plaintiff's Mental Impairments

### (a) Arlene Broska, Ph.D.

On September 22, 2016, Arlene Broska, Ph.D. conducted a psychiatric evaluation. (R. 405).  Plaintiff explained that she had used cocaine and heroin from age twenty-three until 2006. (*Id.*).  In 2001, Plaintiff's methadone program sent her to Mount Sinai Hospital because she had planned to kill herself by throwing herself down a set of stairs. (*Id.*).

At the examination, however, Plaintiff denied any current suicidal or homicidal ideations, stating that her son "changed [her] life." (*Id.*).  Plaintiff reported difficulty falling and staying asleep, a poor appetite and mood swings, including fits of crying and anger. (*Id.*).  Plaintiff also experienced elevated moods and "a lot of energy," giving her racing thoughts, and causing her to clean the house, help her son with his homework or become talkative. (*Id.*).  Plaintiff also had anxiety, feeling restless, shortness of breath, and a need to "walk[] back and forth." (R. 405-06).  Plaintiff stated that she did not like being alone. (R. 406).  She denied thought disorder symptoms but stated that cognitively, she had difficulty concentrating. (*Id.*).

15

In terms of daily living, Plaintiff advised that she was able to dress, bathe and groom herself daily, as well as care for her son with her partner's help. (R. 407).  She also cooked and prepared food three times per week, and cleaned, did laundry and shopped once per week. (*Id.*). Plaintiff preferred to travel with someone else because she did not like being around a lot of people, and managed her money with her partner's help. (*Id.*).

Plaintiff attended a weekly methadone program and took 100 mg of methadone every day. (R. 406).  Plaintiff reported being in psychiatric treatment for the past three to four years at SBH, seeing a psychiatrist named Dr. Iloh monthly and a therapist named "Rudy" every two weeks. (R. 405).  Before that, she was treated at Puerto Rican Family Institute and East Tremont Mental Health Center. (*Id.*).  In addition to methadone, Plaintiff took Percocet, escitalopram, buspirone, quetiapine, zolpidem and Ventolin. (*Id.*).  She had never been hospitalized for medical reasons but had asthma and a "back problem." (*Id.*).

On examination, Plaintiff's demeanor and responsiveness to questions were cooperative. (R. 406).  Her manner of relating, social skills and overall presentation were adequate. (*Id.*).  She was appropriately dressed and well-groomed, with appropriate eye contact and normal posture and motor behavior. (*Id.*).  With respect to her speech, her intelligibility was fluent, her voice was clear, and her expressive and receptive language were adequate. (*Id.*).  Plaintiff's thinking was coherent and goal directed, without evidence of hallucinations, delusions or paranoia. (*Id.*). Her mood was also neutral, her sensorium clear, and her attention and concentration intact. (*Id.*). Dr. Broska found Plaintiff's recent and remote memory skills mildly impaired, given that she could recall three out of three objects immediately and two out of three objects after five minutes. (*Id.*).  She further opined that Plaintiff's insight and judgment were fair, and Plaintiff's intellectual functioning was average. (R. 407).

16

Dr. Broska diagnosed Plaintiff with "[u]nspecified bipolar and related disorder," heroin use disorder in treatment with agonist therapy, and cocaine use disorder in remission. (*Id.*). Vocationally, Plaintiff had moderate limitations in maintaining a regular schedule and appropriately dealing with stress, as well as mild limitations relating adequately with others and making appropriate decisions. (*Id.*). However, she was not limited in following and understanding simple directions and instructions, performing simple or complex tasks independently, maintaining attention and concentration, and learning new tasks. (*Id.*). Dr. Broska opined that these results were consistent with psychiatric and substance abuse problems but "d[id] not appear to be significant enough to interfere with the claimant's ability to function on a daily basis." (*Id.*). She recommended continuation of mental health treatment and the methadone program, and declared a fair prognosis. (*Id.*).

**(b) Laura Kerenyi, Ph.D.**

Dr. Laura Kerenyi conducted another psychiatric evaluation on November 16, 2017. (R. 566). In 2007, Plaintiff was investigated by the Administration for Children's Services ("ACS") for her drug use, causing her children to be placed in foster care for ten months. (R. 567). Plaintiff was required to participate in a methadone program in order to reclaim custody of her son. (*Id.*). She was last employed as a housekeeper in 2010, but was forced to stop working after one year due to back problems. (R. 566).

Plaintiff reported seeing a psychiatrist named "Dr. Cozart" [sic] monthly for the past six months as well as a therapist named "Rudy Mesa" [sic] twice per month for the past four years, both at SBH. (*Id.*). She denied any history of psychiatric hospitalization. (*Id.*). However, her current functioning was limited by difficulty falling asleep and frequent waking three to four times each night. (*Id.*). Plaintiff had also experienced loss of appetite, losing seven pounds in the past month, as well as symptoms of anxiety, including excessive apprehension, worry and

muscle tension. (R. 566-567).  She described phobias of crowds and heights, as well as bimonthly panic attacks causing shortness of breath, typically triggered by arguments with her partner. (R. 567).  Plaintiff also reported manic episodes, the last of which had lasted several hours, wherein she experienced inflated self-esteem, grandiosity, talkativeness and pressured speech, distractibility, psychomotor agitation, excessive involvement in pleasurable activities, flight of ideas and increased goal-directed activity. (*Id.*).  In addition, Plaintiff experienced hallucinations of someone calling her name, though no command, derogatory or paranoid auditory hallucinations and no delusions or paranoid ideation. (*Id.*).  Plaintiff denied any trauma, depressive symptomatology or suicidal or homicidal ideations in the prior thirty days. (R. 566-67).  Nor did she report any cognitive symptomatology. (R. 567).

Plaintiff was able to dress, bathe and groom herself, as well as cook, prepare food, shop and clean. (R. 569).  Plaintiff's partner did her laundry. (*Id.*).  Plaintiff also needed assistance from her partner in managing money and was unable to drive. (*Id.*).  However, she took public transportation independently. (*Id.*).  Plaintiff reported good relationships with her partner and son, and spent most days at home watching television. (*Id.*).

On examination, Plaintiff exhibited an adequate manner of relating and normal appearance. (R. 568).  Dr. Kerenyi noted that Plaintiff wore glasses. (*Id.*).  Plaintiff's speech, thought processes, mood and affect were normal except that Plaintiff reported feeling "sad" that day. (*Id.*).  Dr. Kerenyi found Plaintiff's attention and concentration mildly impaired, but Plaintiff's recent and remote memory skills were intact. (*Id.*).  As to Plaintiff's insight and judgment, both were fair, and Plaintiff's intellectual functioning was average. (R. 568-69).

Dr. Kerenyi diagnosed bipolar II disorder, specific phobia to crowds and heights, and substance abuse disorder in full remission. (R. 570).  In a medical source statement, Dr. Kerenyi

opined that Plaintiff was mildly limited in her ability to understand, remember or apply complex directions and instructions, use reason and judgment to make complex work-related decisions, and regulate emotions, control behaviors, and maintain well-being. (R. 569, 571).  However, Plaintiff was not limited in understanding, remembering or applying simple directions and instructions or interacting adequately with supervisors, coworkers and the public. (R. 569-72). Dr. Kerenyi also did not find any limitations in sustaining concentration and performing at a consistent pace, or maintaining an ordinary routine and regular attendance at work. (*Id.*).  Nor was Plaintiff limited in maintaining personal hygiene and appropriate attire, or staying aware of normal hazards and taking appropriate precautions. (*Id.*).

Dr. Kerenyi concluded that although the results of the examination were consistent with psychiatric problems, they were not significant enough to interfere with Plaintiff's daily functioning. (R. 569).  She advised that Plaintiff's impairment would last more than one year with a fair prognosis, and that Plaintiff should continue with her current treatment. (R. 570).

### iii.  State Agency Opinions

On September 29, 2016, Single Decision Maker ("SDM") C. Coulson evaluated the available medical evidence and provided an RFC assessment. (R. 115-17).  SDM Coulson found that Plaintiff had exertional limitations preventing her from occasionally lifting and/or carrying over fifty pounds; frequently lifting and/or carrying over twenty-five pounds; and sitting, standing and/or walking for more than six hours in an eight-hour workday. (R. 115-16).  Plaintiff also exhibited postural limitations precluding her from more than occasionally balancing, stooping, kneeling, crouching, crawling and climbing ramps, stairs, ladders, ropes and scaffolds. (R. 116).  With regard to environmental limitations, SDM Coulson found that Plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases and poor ventilation. (R. 116-17).

19

On September 30, 2016, state agency consultant T. Harding, Ph.D. opined that Plaintiff had severe spine disorders, asthma and affective disorders that did not meet a listing level. (R. 113-14).  Dr. Harding found that Plaintiff had mild restrictions of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace. (R. 114).  He also found insufficient evidence of repeated episodes of decompensation. (*Id.*).  In addition, Dr. Harding indicated that a consultative examination was required because the current medical record was insufficient to support a decision on Plaintiff's claim. (R. 113).

In an assessment of Plaintiff's mental RFC, Dr. Harding found that Plaintiff had moderate limitations in understanding and remembering detailed instructions, but was not significantly limited in remembering locations and work-life procedures or understanding and remembering very short and simple instructions. (R. 117-18).  As to concentration and persistence, Plaintiff was moderately limited in maintaining attention and concentration for extended periods, as well as carrying out detailed instructions. (R. 118).  However, she was not significantly limited in carrying out very short and simple instructions, making simple work-related decisions, working in coordination with or in proximity to others without being distracted by them, sustaining an ordinary routine without special supervision, performing activities within a schedule, maintaining regular attendance, or being punctual within customary tolerances. (*Id.*).  Nor was she significantly limited in completing a normal, uninterrupted workday and workweek or performing at a consistent pace without an unreasonable number and length of rest periods, in spite of her psychologically based symptoms. (*Id.*).  Socially, Plaintiff was moderately limited in accepting instructions and responding appropriately to criticism from supervisors, yet not significantly limited in any other skills, such as interacting appropriately with the public, asking

20

simple questions or requesting assistance, getting along with coworkers or peers without distracting them or exhibiting behavioral extremes, or maintaining appropriate behavior and adhering to basic standards of neatness and cleanliness. (*Id.*).  Dr. Harding did not detect any significant adaptation limitations. (R. 119).

Dr. Harding concluded that Plaintiff retained the mental RFC for "unskilled work tasks" and based on her physical limitations, retained "medium" maximum sustained work capability. (R. 119-20).

**C. Nonmedical Evidence**

Plaintiff completed a disability report on August 17, 2016 claiming that her bipolar disorder, depression, anxiety, insomnia, memory loss and lower back pain all limited her ability to work. (R. 275).  Plaintiff indicated that she could not speak and understand English and that she preferred to speak in Spanish. (R. 274).  However, she also indicated that she was able to read and understand English and that she could write more than her name in English. (*Id.*).  She also stated that she completed the report herself. (R. 275).

Shiann McCutchen, Plaintiff's social security case manager, completed a third party function report on Plaintiff's behalf on July 28, 2016. (R. 263-70).  According to Mr. McCutchen, Plaintiff's medical conditions caused a "major change to [Plaintiff's] activity," requiring her to spend most of her time at home and not work. (R. 267).  Plaintiff's conditions prevented her from sleeping, and "there [we]re many days when [Plaintiff's] personal hygiene . . . [was] overshadowed by lack of sleep." (R. 264).  He also indicated problems in working, walking, physical exertion, lifting, squatting, standing, reaching, kneeling, climbing stairs, pushing, pulling and bending. (R. 264-68).  Plaintiff could walk three blocks before needing to rest. (R. 268).  Plaintiff also struggled with seeing, memory, completing tasks, concentration and getting along with others, and needed reminders to take her medication and attend her

appointments. (R. 265, 267-68).  She could not finish what she started, could only "sometimes" follow written or spoken instructions, and had difficulty paying attention. (R. 268).

Plaintiff was able to cook herself "fast meals," do household chores, walk her dog, and go out alone, using public transportation or riding in a car. (R. 263, 265-66).  She also shopped for groceries and personal items. (R. 266).  However, she could not handle money due to lack of focus, and her hobbies and interests were limited to watching television. (R. 266-67).  Although Plaintiff spent time with family and friends, she lacked a "social life that would be consist[e]nt with established norms." (R. 267).  She did not have problems with authority figures, and handled changes in her routine "okay," but did not handle stress well. (R. 269).

In an adult function report dated September 2, 2016, Plaintiff answered all questions requiring a narrative response in Spanish, but checked boxes affirming or denying certain statements in English. (R. 296-304).  Plaintiff indicated that she needed assistance caring for others, remembering to take her medicine and taking care of her personal needs, and that her conditions affected her sleep. (R. 297-98).  At the same time, however, she denied problems with personal care. (R. 297).  She also needed help doing chores, preparing meals and handling money, was unable to go out alone, and lacked a driver's license. (R. 298-300).  She denied involvement in social activities and reported problems getting along with family, friends, neighbors or others. (R. 300-01).  Furthermore, her conditions impacted her abilities to stand, walk, pay attention, remember things and follow spoken and written instructions. (R. 301-03). Plaintiff stated that she wore glasses without specifying any particular situations when she needed them, and did not indicate any problems "seeing." (R. 302).  Plaintiff reported problems getting along with authority figures, but denied losing a job for this reason. (R. 303).  She did not answer any questions regarding her asthma. (R. 303-04).

**D.  Plaintiff's Testimony**

Plaintiff testified in Spanish at the hearing held on July 24, 2018 with the assistance of an interpreter. (R. 35, 37).  Plaintiff stated that she studied English at school in Puerto Rico from the first to ninth grades, but always got a D. (R. 38-39).  Although the courses she took involved reading books in English, Plaintiff maintained that she could not read English. (R. 39-40). Nonetheless, she had never been held back from moving on to the next grade. (R. 39).  Plaintiff's last job was cleaning houses in 2013. (R. 40).  Plaintiff currently lived with her partner and eleven-year-old son. (R. 44).  She also had an adult daughter living in Florida. (R. 45).

After noting that Plaintiff had been denied social security benefits three times, the ALJ asked Plaintiff why she continues applying and whether her health had changed between December 18, 2015, the date her most recent claim that was denied, and the current date. (R. 41, 47-48).  Plaintiff reported that she "fe[lt] sick," (R. 47), and "a lot" had changed with respect to both her mental and physical health, (R. 42).  With respect to her mental health, Plaintiff heard voices and her anxiety and depression had worsened, such that she only had two "good" days per week and cried the other days. (R. 42-43).  Plaintiff also complained of trouble sleeping. (R. 43). Although Plaintiff's symptoms improved for one month after taking Depakote and she told her doctors that she was feeling better, her depression and anxiety "kept on building" so her psychiatrist also prescribed Vistaril. (R. 44-46).  She often needed to go to the living room because she "want[ed] to scream" due to panic attacks and did not want her son to see her scream. (R. 46).  Plaintiff admitted that her anxiety may be related to the fact that her partner was sick. (R. 46-47).  She reported consistently good relationships with her children, and that her relationship with her partner had not changed in the last two-and-a-half years. (R. 43-44).

With respect to Plaintiff's physical health, she reported "a lot of back pain" from an infection in her back detected by a CT scan in 2013. (R. 47-48). That year, Plaintiff stopped work because the pain prevented her from bending. (R. 48). Although the infection was treated, Plaintiff still continued to experience pain, for which she was prescribed Endocet by Dr. Lopez-Santini, her primary care physician at Mount Sinai. (R. 48, 50). Even so, Plaintiff reported that she was unable to walk a full block without stopping. (R. 51). However, she denied receiving any physical therapy, MRIs or x-rays of her back in the last two-and-a-half years. (R. 50-51).

In addition to her back pain, Plaintiff reported having four hernias, but was told that none required surgery because they did not "bother" her. (R. 51-52). Plaintiff attended a methadone treatment program weekly, though had not used drugs in the last two-and-half years. (R. 49).

Plaintiff's daily activities included cleaning weekly and shopping using a cart her partner bought for her. (R. 52-53). Plaintiff advised that the supermarket was two blocks away from their apartment. (R. 53). Plaintiff testified that she was unable to cook every day and two-and-a-half years ago, she was able to clean three times per week. (R. 52). Her partner and son helped her with some chores like taking out the garbage. (*Id.*).

**E. Vocational Expert's Testimony**

Vocational expert ("VE") Linda Vause testified at the July 24, 2018 hearing. (R. 21, 40). Ms. Vause reported that Plaintiff's past work as a cleaner qualified as unskilled, light exertional work. (R. 40). The ALJ posed the following residual functional capacity ("RFC") hypothetical to Ms. Vause:

> I want you to assume an individual the same age, education and experience as the claimant. I'd like you to presume . . . that the claimant . . . can perform the full range of medium with only occasional stooping, kneeling, crouching and crawling.

(R. 55).  Based on the assumptions provided by the ALJ, Ms. Vause testified that such an individual could return to Plaintiff's past work. (*Id.*).

The ALJ then posed several additional hypotheticals with further limitations. (R. 55-59). First, the ALJ asked whether the hypothetical individual could perform Plaintiff's past work if, in addition to the limitations in the RFC, he or she was limited to only occasional interaction with coworkers, supervisors and the public. (R. 55).  Ms. Vause testified that such an individual would still be able to return to Plaintiff's past work. (*Id.*).  Second, the ALJ asked whether the individual could return to Plaintiff's past work if, in addition to the limitations in the prior hypothetical, the individual could not work in tandem with coworkers or perform assembly line work. (R. 55-56).  Ms. Vause maintained that the individual would still be able to do Plaintiff's past work, and would be eligible for additional light jobs such as a photocopying machine operator, an advertising material distributor and a marker. (R. 56).  In the next hypothetical, the ALJ asked which of these jobs would apply if, in addition to the other limitations, the individual could only perform light exertional work and was limited to standing and walking for four hours in an eight hour day. (R. 57).  Ms. Vause responded that such a hypothetical individual could work as an advertising material distributor, a marker or a routing clerk. (*Id.*).  In two further hypotheticals, the ALJ asked whether the hypothetical individual could work if on top of the other limitations, she was off task more than fifteen percent of the workday, or absent two or more times per month or had two or more unscheduled monthly absences. (*Id.*).  Ms. Vause testified that in either situation, the individual would not be employable. (*Id.*).

Finally, the ALJ posed two hypotheticals based on the hypothetical individual's English language skills. (R. 58-59).  First, the ALJ asked whether the individual would be employable if, in addition to the limitations posed by the "most restrictive" hypothetical including only four

hours of walking and standing and four hours of sitting, the individual was "illiterate in English and only communicates in Spanish." (R. 58). Ms. Vause responded that in that scenario, there would be no jobs, as being "illiterate in English . . . would reduce [the individual] to assembly line work," which was foreclosed by the most restrictive hypothetical. (*Id.*). The ALJ then asked whether the hypothetical individual would be employable if, instead of being illiterate in English, he or she had Level 1 English language skills, which Ms. Vause defined as equivalent to a first to third grade level. (R. 59). Ms. Vause opined that such an individual could work as a marker, photocopying machine operator and advertising material distributor, but not a routing clerk. (*Id.*)

**F.  ALJ Elias Feuer's Decision**

In his decision, dated October 16, 2018, ALJ Feuer followed the five-step procedure established by the Commissioner for evaluating whether an individual is disabled. *See* 20 C.F.R. §§ 404.1520(a); 416.920(a). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since July 28, 2016, the date of Plaintiff's application. (R. 23). At step two, the ALJ found that Plaintiff had the following severe impairments: depression, anxiety, bipolar disorder, borderline personality disorder and low back pain syndrome. (R. 23). At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix I. (R. 23-24).

Before step four, the ALJ made the following assessment of Plaintiff's RFC:

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 416.967(b) except that the claimant is limited to sitting four hours and standing and walking four hours in an eight hour work day; she can occasionally stoop, kneel, crouch and crawl and can only have occasional interaction with co-workers, supervisors and the public and she cannot work in tandem with co-workers or perform work in an assembly line.

(R. 25).  At step four, the ALJ found that Plaintiff was unable to perform any past relevant work. (R. 29).  Proceeding to step five of the sequential analysis, the ALJ considered Plaintiff's age, education, work experience, ability to communicate in English and RFC, and concluded that there are jobs that exist in significant numbers in the national economy that Plaintiff could perform. (R. 29-30).  Relying upon the testimony of the vocational expert, the ALJ stated that Plaintiff could perform the requirements of representative occupations such as an advertising material distributor and a routing clerk. (R. 30).  Accordingly, the ALJ determined that Plaintiff was not disabled. (*Id.*).

## II.  DISCUSSION

Plaintiff argues that remand is warranted because (1) the ALJ's RFC assessment was flawed; (2) the ALJ failed to properly evaluate whether her impairments met or medically equaled a listed impairment; (3) the vocational expert's testimony was incorrect; and (4) the ALJ erroneously evaluated Plaintiff's English language skills.

## A.  Legal Standards

A claimant is disabled if he or she "is unable 'to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (quoting 42 U.S.C. § 423(d)(1)(A)).  The SSA has enacted a five-step sequential analysis to determine if a claimant is eligible for benefits based on a disability:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past

> relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008); 20 C.F.R. §§ 416.920(a)(4)(i)-(v), 404.1520(a)(4)(i)-(v)).

The claimant has the general burden of proving that he or she is statutorily disabled "and bears the burden of proving his or her case at steps one through four." *Cichocki*, 729 F.3d at 176 (quoting *Burgess*, 537 F.3d at 128). At step five, the burden then shifts "to the Commissioner to show there is other work that [the claimant] can perform." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 445 (2d Cir. 2012).

## B. Standard of Review

When reviewing an appeal from a denial of SSI or disability benefits, the Court's review is "limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)); *see also* 42 U.S.C. § 405(g). The Court does not substitute its judgment for the agency's, "or determine *de novo* whether [the claimant] is disabled." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012) (alteration in original) (quoting *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998)). However, where the proper legal standards have not been applied and "might have affected the disposition of the case, [the] court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)). Therefore, "[f]ailure to apply the correct legal standards is grounds for reversal." *Id.* "Where there are gaps in the administrative record or the ALJ has applied an

improper legal standard," remand to the Commissioner "for further development of the evidence" is appropriate. *Rosa v. Callahan*, 168 F.3d 72, 82–83 (2d Cir. 1999) (quoting *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996)).

## C.  Plaintiff's Physical Impairments

Plaintiff alleges that the ALJ's RFC assessment with regard to her physical impairments was flawed because (1) the ALJ ignored potential disabling effects of Plaintiff's obesity; and (2) the ALJ improperly disregarded Dr. Archbald's opinion that Plaintiff could only stand and walk for two hours in an eight-hour workday, should avoid triggers of her asthma, and should avoid activities involving fine visual acuity. (Docket No. 14 at 20-22, 25 n.11).  Plaintiff also asserts that the ALJ erroneously relied on the VE's opinion regarding work Plaintiff could perform in the national economy because the VE's opinion conflicted with the D.O.T. and Plaintiff's RFC. (*Id.* at 25-26).  The Commissioner argues that the ALJ's decision should be affirmed because it is legally correct and is supported by substantial evidence. (Docket No. 22 at 12-18, 20-21).

## 1.  The ALJ's RFC Assessment

## i.  Plaintiff's Obesity

Plaintiff claims that the ALJ failed to consider her obesity despite numerous references to this condition throughout the medical record, and that this shortcoming was harmful error because this condition "would have exacerbated her asthma, right knee pain, and lower back syndrome," and "interfered with [her] psychiatric medical regimen." (Docket No. 14 at 20-21). The Commissioner counters that the ALJ did not ignore Plaintiff's obesity, but rather, noted Plaintiff's height and weight and implicitly considered her obesity's effects by relying upon medical opinions and treatment notes that discussed them. (Docket No. 22 at 16-17).  The Court agrees with the Commissioner that the ALJ specifically acknowledged Plaintiff's height and weight and adequately considered her obesity.

Although "[o]besity is not in and of itself a disability[,] . . . [it] may be considered severe—and thus medically equal to a listed disability—if alone or in combination with another medically determinable . . . impairment(s), it significantly limits an individual's physical or mental ability to do basic work activities." *Cruz v. Barnhart*, No. 04–CV–9011 (GWG), 2006 WL 1228581, at *10 (S.D.N.Y. May 8, 2006); *see also* Social Security Ruling, SSR 02-1p; Titles II and XVI: Evaluation of Obesity, 2002 WL 34686281, at *4 (Sept. 12, 2002).  As a result, where the record contains evidence of functional limitations due to obesity, the ALJ must consider its effects on the claimant's ability to do basic work activities at steps two through four of the sequential evaluation process, even when the claimant did not allege obesity as an impairment. *See Sotack v. Astrue*, No. 07–CV–0382, 2009 WL 3734869, at *4–5 (W.D.N.Y. Nov. 4, 2009).  The agency has also stated that the ALJ "will explain how [he or she] reached [his or her] conclusions on whether obesity caused any physical or mental limitations." SSR 02–1p, 2002 WL 34686281, at *7.

However, an ALJ's failure to explicitly address a claimant's obesity does not necessarily warrant remand where the claimant's treating or examining sources did not consider it a significant factor limiting his or her ability to perform work related activities. *See Farnham v. Astrue*, 832 F. Supp. 2d 243, 261 (W.D.N.Y. 2011); *Guadalupe v. Barnhart*, No. 04 CV 7644 (HB), 2005 WL 2033380, at *6 (S.D.N.Y. Aug. 24, 2005).  To the contrary, an ALJ may "implicitly factor[] [a claimant's] obesity into his RFC determination by relying on medical reports that . . . note[] [the claimant's] obesity and provide[] an overall assessment of her work-related limitations." *Drake v. Astrue*, 443 F. App'x. 653, 657 (2d Cir. 2011); *see also Guadalupe*, 2005 WL 203380 at *6.  This is so even if a treating physician advises a plaintiff to "lose weight" without specifying his or her weight as limiting. *See Vanderhorst v. Berryhill*, No.

30

17CV10205 (WHP) (DF), 2019 WL 3416003, at *12, 14 (S.D.N.Y. June 25, 2019), *report and recommendation adopted sub nom. Vanderhorst v. Saul*, 2019 WL 3409795 (S.D.N.Y. July 29, 2019).

To sufficiently account for a claimant's obesity, a relied-upon medical opinion need not itself use the word "obese," as long as the physician's notes or records demonstrate that the condition was recognized. *See, e.g.*, *Bonilla-Bukhari v. Berryhill*, 357 F. Supp. 3d 341, 353 (S.D.N.Y. 2019) ("While [the treating physician] did not explicitly note that [the claimant] was obese, he did note that she had a height of five feet two inches and a weight of 176 pounds, . . . which would mean [she] had a Body Mass Index between 30 and 31, making her obese."); *Rivera v. Berryhill*, No. 1:15-cv-0487-MAT, 2018 WL 375846, at *4 (W.D.N.Y. Jan. 11, 2018) (ALJ did not err in failing to explicitly discuss obesity where consultative examiner noted plaintiff's height and weight, and record contained "sporadic mentions of plaintiff's obesity" elsewhere); *Wilson v. Colvin*, No. 14cv5666 (DF), 2015 WL 5786451, at *30 (S.D.N.Y. Sept. 29, 2015) (ALJ "indirectly" considered obesity where treating and consulting physicians' notes "indicate[d] that they were aware of Plaintiff's weight, relative to her height" and recorded her BMI, and ALJ used the same records to identify limitations unrelated to obesity).

Here, the record is replete with explicit and implicit references to Plaintiff's obesity, but it lacked any medical opinion or any other evidence that this condition "exacerbated" Plaintiff's alleged physical impairments or disrupted her psychiatric care. (Docket No. 14 at 21).  Dr. Lopez-Santini, Plaintiff's treating physician, repeatedly described Plaintiff as obese and/or overweight, (R. 426-28, 423-24, 700, 704, 711, 716-18, 719-21, 436-38, 728-30), and Plaintiff's various psychiatrists noted a connection between Plaintiff's use of Seroquel and metabolic issues, (R. 365, 562).  These same treatment notes also evidence Plaintiff's efforts to lose weight

via diet and exercise, bariatric surgery, and eventually, reducing her Seroquel intake. (R. 440-41, 480, 548, 601, 620, 732-33, 753, 788). However, none of these notes evidence functional limitations stemming from Plaintiff's weight, or a connection between Plaintiff's weight and reported back or knee pain, even though Plaintiff was described as obese when she complained of this pain in October 2017. *See Vanderhorst*, 2019 WL 3416003, at *14; R. 711.[12] Furthermore, the notes suggest that Dr. Lopez-Santini did not believe that Plaintiff's weight was exacerbating her pain, as Dr. Lopez-Santini herself never recommended that Plaintiff diet or otherwise lose weight, instead prescribing as treatment a back brace and pain medication. *See Vanderhorst*, 2019 WL 3416003, at *14; R. 711-12. Although Dr. Lopez-Santini identified a connection between Plaintiff's weight and hypertension at one appointment, she observed that Plaintiff's hypertension "became controlled after weight loss" from bariatric surgery and never indicated that it became problematic again—even when Plaintiff's weight increased. (R. 441). Nor did Dr. Lopez-Santini ever designate obesity as a separate diagnosis requiring targeted treatment. *See Rivera*, 2018 WL 375846, at *5.

This conclusion comports with Dr. Archbald's findings based on two examinations, which the ALJ assigned "significant weight." (R. 28). Dr. Archbald accounted for Plaintiff's obesity by noting that Plaintiff was 5'3" and 194 pounds in 2016, (R. 410), and 5'4" and 194 pounds the following year, (R. 575; *see supra* n. 11), yet never opined that Plaintiff's obesity caused any of Plaintiff's limitations. *See Rivera*, 2018 WL 375846, at *4–5. In both 2016 and 2017, Dr. Archbald found that Plaintiff demonstrated a normal gait, used no assistive devices,

---

[12] That Plaintiff's psychiatrists encouraged her to reduce her intake of Seroquel because of its potential relationship to weight gain does not change the analysis. (R. 365, 562). Aside from Plaintiff's conclusory assertions, (Docket No. 14 at 21), there is no indication from the psychiatric notes that any weight gain resulting from Seroquel was the root of Plaintiff's psychiatric limitations. *See Bonilla-Bukhari*, 357 F. Supp. 3d at 353. To the contrary, notes from Dr. Cozort indicated that Plaintiff initially refused to reduce her Seroquel intake precisely because it helped her cope with anxiety. (R. 478-80). Moreover, Plaintiffs' psychiatrists are not qualified to opine on physical limitations. *See Infanzon v. Berryhill*, No. 15-cv-6826 (KBF), 2017 WL 3535297, at *11 (S.D.N.Y. Aug. 17, 2017).

and had no difficulty getting on and off of the examination table or rising from a chair.  (R. 575).

The only musculoskeletal limitations she detected were moderate limitations in bending, and

mild limitations in squatting, kneeling on her right knee and climbing stairs—which she

expressly linked to knee pain and Plaintiff's history of back pain, rather than obesity. (R. 576).

The ALJ expressly relied on the above treatment notes and conclusions to determine that

Plaintiff was limited to four hours of sitting plus four hours of standing and walking in an eight

hour workday, and only occasional stooping, kneeling, crouching and crawling. (R. 25, 28-29).

Because these records all implicitly or explicitly recognized Plaintiff's obesity, yet did not

categorize it as limiting, the ALJ appropriately considered it and determined that it did not result

in additional restrictions that would impact Plaintiff's ability to work. *See Vanderhorst*, 2019

WL 3416003, at *14 (holding that RFC with respect to obesity was supported by substantial

evidence where treatment notes and consultative opinion were "consistent with" each other).

This is especially so where Plaintiff did not list obesity as a disabling impairment in her intake

paperwork, nor did she or her counsel mention it at the hearing. *See Bonilla-Bukhari*, 357 F.

Supp. 3d at 353–54; *Battle v. Colvin*, No. 13-CV-547-JTC, 2014 WL 5089502, at *6 (W.D.N.Y.

Oct. 9, 2014); R. 275.  For all of these reasons, the ALJ's RFC assessment with respect to this

issue is supported by substantial evidence. *See Vanderhorst*, 2019 WL 3416003, at *14.

On this record, the ALJ weighed Plaintiff's obesity to the extent necessary by expressly

considering the above-mentioned findings that addressed it directly, but simply did not conclude

that it disabled Plaintiff.  Thus, the Court cannot disturb the ALJ's opinion since it is based on

substantial evidence.

## ii.  Plaintiff's Asthma, Difficulties in Standing and Walking, and Vision

Plaintiff next contends that the ALJ's RFC assessment was erroneous because it

improperly disregarded Dr. Archbald's conclusions regarding Plaintiff's asthma, difficulties in

standing and walking, and low "fine visual acuity." (Docket No. 14 at 22 & n.9, 25 & n.11).  The

Commissioner responds that the ALJ considered the limitations stemming from these conditions

except for Plaintiff's low visual acuity,[13] and assigned a proper RFC based on the balance of

evidence, including few physical complaints, conservative treatment, Plaintiff's activities of

daily living, and limited objective testing and physical examination findings. (Docket No. 22 at

16-18).  The Court agrees with the Commissioner that the ALJ properly addressed Plaintiff's

asthma and difficulties in standing and walking, and provided sufficient reasons for disregarding

Dr. Archbald's opinion.  The same is true with regard to Plaintiff's vision.

It is not required that the ALJ's RFC assessment "perfectly correspond" with any of the

medical source opinions cited in his or her decision. *Matta v. Astrue*, 508 F. App'x. 53, 56 (2d

Cir. 2013) (summary order).  Rather, the ALJ is "entitled to weigh all of the evidence available

to make an RFC finding that [i]s consistent with the record as a whole." *Id.*  Furthermore, an ALJ

may decline to accept some conclusions of a medical opinion when they are inconsistent with the

rest of the record. *See Pellam*, 508 F. App'x at 89-90; *Jackson v. Berryhill*, No. 17-CV-6268-

FPG, 2018 WL 3306193, at *7 (W.D.N.Y. July 5, 2018).  However, when doing so, the ALJ

must explain the basis of his or her decision to reject the unadopted portions. *See Mack v.

Comm'r of Soc. Sec.*, No. 17-CV-991, 2019 WL 2529386, at *4 (W.D.N.Y. June 19, 2019).  This

is especially a concern when the ALJ selects "only the least supportive portions of a medical

source's statement," and rejects portions that would support a finding of disability. *See Solsbee v.

Astrue*, 737 F. Supp. 2d 102, 114 (W.D.N.Y. 2010); *see also Kande v. Comm'r of Soc. Sec.*, No.

19-CV-3578 (KNF), 2020 WL 3871218, at *8 (S.D.N.Y. July 9, 2020); *Younes v. Colvin*, No.

1:14-CV-170 (DNH/ESH), 2015 WL 1524417, at *8 (N.D.N.Y. Apr. 2, 2015).

---

[13] The Commissioner does not address Plaintiff's argument with respect to her vision. (*See generally* Docket No.
22).

Notwithstanding this requirement, "[w]hen . . . the evidence of record permits [the Court] to glean the rationale of an ALJ's decision, [the Court] do[es] not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability." *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983). In other words, "[t]he absence of an express rationale does not prevent [the Court] from upholding the ALJ's determination . . . [if] portions of the ALJ's decision and the evidence before him indicate that his conclusion was supported by substantial evidence." *See Berry v. Schweiker*, 675 F.2d 464, 468 (2d Cir. 1982). Remand is thus required when the Court cannot "fathom the ALJ's rationale in relation to evidence in the record," but unnecessary when it is "able to look to other portions of the ALJ's decision and to clearly credible evidence . . . [and conclude] that [the ALJ's] determination [is] supported by substantial evidence." *Id.* at 469.

**(a) Asthma**

Plaintiff contends that "[h]ad the ALJ properly considered [her] . . . asthma" in assessing her RFC, "he would have found that [P]laintiff was at most limited to sedentary work." (Docket No. 14 at 22). Plaintiff further argues that the ALJ's conclusion regarding her asthma's impact on her ability to work was inappropriate because it constituted "[the ALJ's] own lay opinion" rather than that of a medical expert. (*Id.*). To the contrary, the ALJ properly explained his reasons for declining to adopt Dr. Archbald's recommendations and his findings were based on substantial evidence in the medical record. *See Jackson*, 2018 WL 3306193, at *7.

In assigning Dr. Archbald's opinion "significant weight," the ALJ acknowledged Dr. Archbald's recommendation that Plaintiff "needed to avoid asthma triggers," but declined to incorporate it into the RFC because it did not comport with the rest of the record. (R. 28, 411, 576). Indeed, the RFC solely restricts Plaintiff to "a narrowed range of light exertion subject to

[certain] postural limitations" as well as certain psychiatric limitations. (R. 28; *see also* R. 25).
The ALJ explained that "[g]reater restrictions" were "not warranted" because Plaintiff's asthma
"was described as mild and intermittent" and her lungs were consistently "clear on examination."
(R. 28-29). Moreover, there was no indication that Plaintiff had been hospitalized for asthma
since her application date. (R. 29). For these reasons, the ALJ concluded that Plaintiff's asthma
"would not impact [her] ability to work." (*Id.*).

The Court finds that this inconsistency with the rest of the record was an acceptable
reason for declining to adopt some of Dr. Archbald's conclusions, and the ALJ sufficiently
explained this rationale. *See Jackson*, 2018 WL 3306193, at *7; *see also Douglas v. Berryhill*,
No. 17-CV-00694 (JMA), 2019 WL 1017341, at *5–6 (E.D.N.Y. Mar. 4, 2019) (finding ALJ's
explanation of RFC determination sufficient where "weight given to . . . medical opinions
alongside the other medical evidence in the record ma[de] apparent why the ALJ did not fully
credit all of the limitations in [one] opinion"); (R. 28-29). This is not a situation where it is
impossible to "glean from [the ALJ's] opinion[] why he did not adopt [Dr. Archbald's] more
restrictive limitations." *Cf. Palmer v. Berryhill*, No. 3:17 CV 1714 (RMS), 2018 WL 6304349, at
*4 (D. Conn. Dec. 3, 2018). Rather, it is clear from the ALJ's explanation of the evidence that
he disregarded Dr. Archbald's recommendations as to Plaintiff's asthma because they were
unsupported by the record as a whole. *See Jackson*, 2018 WL 3306193, at *7.

Moreover, an independent review of the rest of the record supports the ALJ's conclusion.
*See Pellam*, 508 F. App'x at 90-91. In addition to describing Plaintiff's asthma as "mild" and
"intermittent," (R. 438), Dr. Lopez-Santini opined that Plaintiff's asthma was "stable" on June
21, 2017, (R. 421, 724). Despite a handful of psychiatric appointments where Plaintiff
complained of her asthma "acting out," (R. 478, 546, 618, 786, 460, 532, 609, 770), there are no

treatment notes indicating that Plaintiff sought medical intervention for her asthma or complained of its effects to Dr. Lopez-Santini, the provider who could have addressed such issues.  Rather, Plaintiff consistently reported feeling "well" at her physical examinations, (R. 429, 433, 440-41, 726, 729, 732-33), complaining solely of back pain, knee pain and a hernia on October 17, 2017 and March 6, 2018, (R. 700-01, 711).  Plaintiff told Dr. Archbald that since being diagnosed with asthma at age twenty-five, she had never been hospitalized or visited the emergency room due to this condition. (R. 409).  She further admitted to smoking cigarettes since age twelve, even though cigarette smoke triggered her symptoms. (*Id.*).  Under such circumstances, substantial evidence supports the conclusion that Plaintiff's asthma did not limit Plaintiff's ability to work, and therefore, did not need to be addressed in the RFC.

**(b) Standing and Walking**

The same is true with regard to Plaintiff's complaint that the ALJ limited Plaintiff to light work as well as walking and standing four hours per day, when Dr. Archbald limited her to only two hours of these activities per day. (Docket No. 14 at 19-20, 25 n.11; R. 25, 28, 579).  As with Plaintiff's asthma, the ALJ expressly explained that he did not impose "[g]reater restrictions" with respect to her orthopedic issues because they were unsupported by the medical record. (R. 28).  The ALJ correctly noted that Plaintiff was never prescribed physical therapy nor underwent any other significant treatment for knee, hip or back pain. (*Id.*).  Although Plaintiff was diagnosed with "low back pain syndrome," (R. 445), which required prescription of Percocet, (R. 439), the record showed few positive clinical signs of that condition and her complaints of such pain were "sporadic," (R. 28, *see also* 700-01, 711).  Consistent with this observation, Plaintiff reported feeling "well" in May, July and September 2016, and in June 2017, and demonstrated a normal gait. (R. 28, 420-21, 429, 433, 713-14, 726, 729).  Although Plaintiff did complain of right knee and back pain in October 2017, triggering prescription of a back brace, (R. 711-12),

she "felt well" in March 2018, making no further orthopedic complaints, (R. 28; *see also* R. 700-01).  Furthermore, Plaintiff was able to shop and do household chores. (R. 28, 53, 266, 575).[14]

      This detailed explanation is more than adequate for the Court "to glean the rationale" of the ALJ's decision, *see Mongeur*, 722 F.2d at 1040, and is supported by the record as a whole, *see Pellam*, 508 F. App'x at 90-91.  The ALJ accounted for the fact that Plaintiff experienced "at least some pain," that her range of motion was somewhat limited at some appointments, and that she required medications to manage her orthopedic issues, yet found that this evidence was outweighed by other indications that Plaintiff could handle lesser restrictions than those Dr. Archbald recommended. *See id.*; (R. 28).  Moreover, despite limiting standing and walking to two hours, Dr. Archbald only diagnosed "mild" limitations in squatting, kneeling on the right knee, and climbing stairs, and "moderate" limitations in bending, while consistently noting a normal stance and that Plaintiff could walk on her heels and toes. (R. 410-11, 575-76).  Similarly, although x-rays demonstrated low back pain syndrome, (R. 445), and Plaintiff's complained of back and knee pain in October 2017, (R. 711), the treatment notes indicated consistently normal musculoskeletal examinations, with no instances of difficulty standing or walking, (R. 421, 711, 714).  Although Plaintiff initially testified that she could only walk half of a block, she later admitted that she regularly walked "two blocks" from her home to the grocery store. (R. 51-53).  In his third party function report, Mr. McCutchen also noted that Plaintiff regularly walked her dog and used public transportation on her own. (R. 263, 266).  In light of this evidence, ALJ was entitled to discount Dr. Archbald's findings to fashion an RFC that conformed with the record as a whole. *See Matta*, 508 F. App'x. at 56.

---

[14] However, the ALJ incorrectly noted that the evidence from Mr. McCutchen's report came from Plaintiff's report. (R. 29, 263).

Moreover, to the extent Plaintiff argues that because the RFC limited her to less than six hours of standing and walking, the ALJ should have limited her to "less than light work" based on Social Security Ruling 83-10, Titles II & XVI: Determining Capability to Do Other Work-the Med.-Vocational Rules of Appendix 2, SSR 83-10, 1983 WL 3125 (Jan. 1, 1983), that argument is unavailing. (Docket No. 14 at 19).  The ALJ expressly found that Plaintiff was limited to light work but with additional modifications,[15] including the walking and standing limitations already discussed. (R. 28; *see also* R. 25).  Given the benign findings and Plaintiff's varied daily activities, substantial evidence supports the conclusion that Plaintiff was capable of performing light work with the walking modifications already provided. *See Cichocki v. Astrue*, 729 F.3d 172, 178 (2d Cir. 2013) (ALJ's determination that plaintiff could perform light work, subject to modifications, was supported by substantial evidence where plaintiff could "stand for four hours and walk for three hours in an eight-hour workday" and "performed numerous daily tasks, such as walking her dogs and cleaning her house, that are consistent with a residual capacity to perform light work").[16]

**(c) Fine Visual Acuity**

Plaintiff alleges that the ALJ further erred by "fail[ing] to consider Dr. Archbald's opinion that [she] should limit activities involving fine visual acuity." (Docket No. 14 at 22 n.9). The Commissioner does not respond to this argument. (*See generally* Docket No. 22).  The Court finds that although the ALJ did not explicitly discuss this aspect of Dr. Archbald's opinion, his

---

[15] Light work "requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 416.97.

[16] In addition, Social Security Ruling 83–10 only suggests six-hour requirements for light work; its language is "merely precatory" and, thus, is not binding on the ALJ.  *See Par. v. Apfel*, 70 F. Supp. 2d 279, 284 (W.D.N.Y. 1999).

discussion of the evidence as a whole is sufficient to understand his reasoning in excluding any vision issues from the RFC, and this determination was supported by substantial evidence.

Plaintiff bears the burden of establishing her RFC. 20 C.F.R. § 404.1512(c). "Step Four findings need only afford[ ] an adequate basis for meaningful judicial review, appl[y] the proper legal standards, and [be] supported by substantial evidence such that additional analysis would be unnecessary or superfluous[.]" *McIntyre*, 758 F.3d at 150 (quoting *Cichocki*, 729 F.3d at 177) (alterations in original). There is also no requirement that the ALJ explicitly mention every one of the claimant's limitations. *See Connole v. Astrue*, No. 3:10-cv-01382 (JAM), 2016 WL 1626816, at *5 (D. Conn. Apr. 25, 2016); *see also id.* (affirming ALJ's findings at step four that "did not explicitly include [the plaintiff's] non-exertional functional limitations"). As previously noted, "where the rationale of the ALJ's decision can be gleaned from the record, there is no requirement that he specifically discuss or reconcile every potentially conflicting piece of evidence." *Lamb v. Colvin*, No. 1:13–CV–00845 (MAD), 2014 WL 6386993, at *9 (N.D.N.Y. Nov. 14, 2014).

Here, the ALJ's decision did not include an explicit function-by-function analysis of all possible limitations, but did address all relevant limitations, including any stemming from Plaintiff's low back pain syndrome, asthma, hypertension and hernia, as these conditions were specifically documented in the treatment notes, mentioned at the hearing, and/or included in Plaintiff's initial disability paperwork. *See Cickocki*, 729 F.3d at 178; (R. 28-29, 51-52, 275, 441). Plaintiff's objection, which appears in a single, conclusory footnote,[17] stems from one sentence in Dr. Archbald's first report noting "limit[ations]" in "activities involving fine visual

---

[17] Although the Court need not address this argument because it is undeveloped, the Court will briefly analyze whether this oversight requires remand. *See Cunningham v. Comm'r of Soc. Sec.*, No. 17-CV-1135-FPG, 2019 WL 2059213, at *4 n.3 (W.D.N.Y. May 9, 2019).

acuity" based on a Snellen test showing 20/30 in her right eye and 20/40 in her left eye, with 20/30 for both eyes at twenty feet, corrected. (R. 409, 411).  The following year, however, Dr. Archbald denied that Plaintiff had "visual impairments" or any limitations stemming therefrom, even though the results of Plaintiff's vision test were similar to those of the previous year. (R. 581, 583).[18]

The ALJ expressly addressed both of Dr. Archbald's reports, but as previously explained, found "greater restrictions" than those in the RFC unwarranted due to the lack of physical complaints in the record and the treatment notes consistently indicating that "the claimant was feeling well" throughout the alleged period of disability. (R. 28).  Moreover, there is no evidence of any diagnoses related to Plaintiff's vision by her treating physician, and Plaintiff did not assert vision problems as a basis for her disability application or in her Function Report. (R. 275, 302). Nor did she mention vision problems to any treating provider or at the hearing when specifically asked what problems limited her ability to work. (R. 47-52).  The ALJ also stated that he "considered all the evidence," (R. 22), "all symptoms[,] [ . . . ] the extent to which these symptoms can reasonably be accepted as consistent with the objective evidence and other evidence . . . [, and] opinion evidence" in accordance with the regulations, (R. 25).

On this record, where the ALJ expressly addressed both of Dr. Archbald's opinions and explained that they were not entirely consistent with Plaintiff's repeated reports of "feeling well," (*e.g.*, R. 423-28, 700-01, 716-21), the Court is satisfied that the ALJ considered Plaintiff's vision and simply discounted it because it was not disabling. *See Mongeur*, 722 F.2d at 1039-40. Even though the ALJ did not overtly discuss it, the Court can infer from the "other evidence in

---

[18] At the second consultative examination with Dr. Archbald's, Plaintiff had 20/25 vision on the right side, 20/25 vision on the left side, and 20/25 vision on both sides on a Snellen chart at twenty feet, corrected. (R. 575).

the record" outlined above that the ALJ reviewed the pertinent evidence and found that it did not limit Plaintiff's ability to work. *See id.*; *see also Durgan v. Astrue*, No. 12-CV-279 (DNH/CFH), 2013 WL 1122568, at *3 (N.D.N.Y. Feb. 19, 2013) ("[A] diagnosis alone is insufficient to establish a severe impairment as instead, the plaintiff must show that the medically determinable impairments significantly limit the ability to engage in basic work activities.").

In addition, this determination is supported by substantial evidence. *See Pellam*, 508 F. App'x at 90-91.  Courts within this Circuit have found that vision issues similar to Plaintiff's need not be incorporated into the RFC because they do not preclude basic work, especially when diagnosed by a non-treating provider and/or not alleged as a basis for disability. *See, e.g.*, *Cervini v. Saul*, No. 17-CV-2128 (JMA), 2020 WL 2615929, at *3, *7–8 (E.D.N.Y. May 21, 2020) (no error in declining to include alleged vision limitations in RFC where consultative examiner noted "fine visual acuity" restriction based on 20/50 vision in both eyes that improved to 20/30 vision with glasses and plaintiff never identified vision as basis for being disabled); *Sanchez v. Saul*, No. 18cv12102 (PGG) (DF), 2020 WL 2951884, at *31 (S.D.N.Y. Jan. 13, 2020), *report and recommendation adopted sub nom. Sanchez v. Comm'r of Soc. Sec.*, 2020 WL 1330215 (S.D.N.Y. Mar. 23, 2020) (rejecting contention that vision issues should have been part of RFC where recommended restriction came from consultative examiner who was "not an expert in the field" and specialist determined that Plaintiff's best corrected visual acuity was 20/20 in both eyes); *Colbert v. Comm'r of Soc. Sec.*, 313 F. Supp. 3d 562, 580–82 (S.D.N.Y. 2018) (declining to remand based on failure to incorporate vision-related limitations where "medical testing . . . reported largely normal results," including 20/30 vision in right eye and 20/25 vision in left eye).

Plaintiff does not point to any evidence that her vision in any way prevented her from functioning or doing basic work activities such that her RFC should have been more restrictive.

(Docket No. 14 at 22 n.9).  Plaintiff therefore has not met her burden to prove a more restrictive RFC. *See Smith v. Berryhill*, 740 F. App'x 721, 726 (2d Cir. 2018).

For all of the above reasons, the ALJ's physical RFC determination was supported by substantial evidence and the Court does not recommend remand on any of the grounds related to this aspect of the ALJ's decision.

## D.  Plaintiff's Psychiatric Impairments

### 1.  Failure to Meet a Listing

Plaintiff argues that the ALJ erred in (1) determining that the severity of her mental impairments did not meet or medically equal the criteria of listing 12.04, which addresses depressive, bipolar and related disorders; and (2) failing to discuss whether such impairments met or medically equaled the criteria of listing 12.06, which covers anxiety disorders. (Docket Nos. 14 at 26-28; 23 at 2).  The Commissioner responds that the ALJ's determination with respect to listing 12.04 is supported by substantial evidence, and that because listing 12.06 has the same criteria as listing 12.04, Plaintiff did not qualify as disabled under listing 12.06. (Docket No. 22 at 22-23).  The Court agrees with the Commissioner that the ALJ properly evaluated Plaintiff's mental impairments in the context of both listings.

When a claimant meets or equals the requirements of a listing, he or she is entitled to an "irrebuttable presumption of disability." *DeChirico v. Callahan*, 134 F.3d 1177, 1180 (2d Cir. 1998).  "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 529-30 (1990).

When a claimant's mental impairments are at issue, the ALJ must use a "special technique" to determine whether they meet or equal a listing. *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (citing 20 C.F.R. § 404.1520a(a)).  Under the "special technique," the ALJ

compares medical evidence about the claimant's mental impairments and her functional limitations with the requirements of the listing. *See Id.* at 266.  Listings 12.04 and 12.06 contain three paragraphs designated A, B and C, and require that a claimant meet the criteria for both paragraphs A and B, or B and C. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, Part A2, Section 12.00 A.2.  Paragraph B rates the degree of the claimant's functional limitation in four "broad functional areas," including (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself. *Id.* Section 12.00 A.2(b); § 404.1520a(c)(3).  To satisfy paragraph B, a claimant's mental impairment must result in "extreme" limitation of one, or "marked" limitation of two of these areas. 20 C.F.R. Part 404, Subpart P, Appendix 1, Section 12.00 A.2(b).  Alternatively, if the claimant does not meet the criteria under paragraph B, he or she may still be presumed disabled under paragraph C if his or her mental disorder is "serious and persistent," such that he or she "rel[ies] . . . upon" mental health treatment on an "ongoing basis," and despite any diminished symptoms, the claimant has "achieved only marginal adjustment." *See Id.* Section 12.00 G.1-2(a)-(c).  The ALJ's written decision "must include a specific finding as to the degree of limitation in each of the functional areas" described above. *See Kohler*, 546 F.3d at 266 (citing 20 C.F.R. § 404.1520a(e)(2)).

Here, the ALJ appropriately analyzed each of the paragraph B factors, citing evidence in support of each consideration.  First, in understanding, remembering or applying information, the ALJ found that Plaintiff was mildly limited. (R. 24)  As support, he correctly observed that the treatment notes "consistently indicated" normal cognitive functioning, and according to the consultative reports, Plaintiff would not have problems doing simple tasks. (*Id.*)  Indeed, Plaintiff's treating psychiatrists all noted "intact" memory and attention skills. (R. 347, 360,

478).  Likewise, Dr. Kerenyi noted "mild" limitations in attention and concentration, (R. 568),

and Dr. Broska observed "mildly impaired" memory, (R. 406), with both examiners finding no

limitations in following and understanding simple directions and instructions. (R. 407, 569, 571).

In interacting with others, the ALJ found Plaintiff moderately limited due to her bouts of

anxiety and anxious mood based on the treatment notes and Dr. Harding's analysis. (R. 24).

Plaintiff argues that she was "at least . . . marked[ly] limit[ed]" in this category due to "severe

symptoms of social withdrawal or isolation." (Docket No. 14 at 27).  To the contrary, although

Plaintiff stated she had "no friends" on some occasions and avoided crowds, (R. 376, 567, 586),

there is scant evidence of "severe" symptoms specifically connected to feelings of withdrawal or

isolation, or social interactions in general, on an ongoing basis.  Plaintiff did report feeling sad

and anxious in the summer of 2017 following an argument with her daughter, (R. 463, 538), and

one set of treatment notes from April 2014 observed "marked" difficulties in maintaining social

functioning, (R. 372-74).  However, the consultative examiners noted no more than mild

difficulties with this skill, (R. 407, 569-72), and after changes to her medications in August 2017,

Plaintiff was described as "calm," "cooperative," "pleasant," and not in "acute distress," (R. 451,

457, 526-27, 606-07, 688, 744, 757).

Next, the ALJ categorized Plaintiff as mildly limited in concentration, persistence or

maintaining pace, as the treatment notes and consultative reports all reflected normal cognitive

functioning, and again, the consultative examiners agreed that Plaintiff would not have problems

with simple tasks or concentration. (R. 24).  None of Plaintiff's treating psychiatrists recorded

deficiencies in concentration. (R. 347, 349, 478).  Furthermore, although Dr. Broska indicated

moderate limitations in maintaining a regular schedule, (R. 407), and Plaintiff had sleeping

difficulties, (R. 368), Dr. Kerenyi noted no limitations in this category, (R. 569-72), and by January 2018, Plaintiff's insomnia was "mild" and "improved," (R. 599-602).[19]

Finally, the ALJ found Plaintiff moderately limited in adapting or managing oneself, as Plaintiff demonstrated difficulties in dealing with stress according to the treatment notes and Dr. Broska's report. (R. 24, 407, 463-65). Plaintiff contends that her documented "severe anxiety, overwhelming nervousness, lack of motivation and crying spells" required a finding of "at least a marked limitation" in this category. (Docket No. 14 at 27). Although Plaintiff is correct that her anxiety was described as "severe," (R. 323), she was described as "doing better" and coping well throughout the relevant period, (R. 478, 492, 688-91). The ALJ also determined that Plaintiff did not meet the paragraph C criteria for listing 12.04. (R. 24).

The Court finds that the ALJ properly evaluated the requirements for mental impairments under listing 12.04, and because his analysis comports with the treatment notes and medical opinions in the record, substantial evidence supports his determination that Plaintiff's mental impairments did not meet or medically equal listing 12.04 or 12.06. *See Rodriguez v. Comm'r of Soc. Sec.*, No. 19-CV-4553 (LJL) (KNF), 2020 WL 5803802, at *7-8 (S.D.N.Y. May 27, 2020), *report and recommendation adopted*, 2020 WL 5802999 (S.D.N.Y. Sept. 29, 2020); *see also Sweet v. Comm'r of Soc. Sec.*, 2016 WL 11478205, *3 (N.D.N.Y.), *report and recommendation adopted*, 2016 WL 4401374 (N.D.N.Y. 2016) ("Under the substantial evidence standard of review, it is not enough for Plaintiff to merely disagree with the ALJ's weighing of the evidence or to argue that the evidence in the record could support her position[;] Plaintiff must show that no reasonable factfinder could have reached the ALJ's conclusion based on the evidence in record."). The ALJ appropriately balanced the impact of Plaintiff's ongoing struggle with her

---

[19] The Court further discusses Plaintiff's alleged difficulties in maintaining a schedule in Section II.E.2.

mental impairments on her functioning with the fact that her symptoms improved over time. *See Santiago v. Saul*, No. 18-CV-4197 (JPO), 2019 WL 4409450, at *5 (S.D.N.Y. Sept. 16, 2019).

Moreover, any error committed by the ALJ in failing to explicitly address listing 12.06 was harmless because that listing has the same paragraph B and C requirements as listing 12.04. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, Section 12.00.A.2. By finding that Plaintiff's mental impairments did not meet the requirements of either of these paragraphs, the ALJ implicitly concluded that these same impairments also did not meet the criteria for listing 12.06. *See Grega v. Berryhill*, No. 17-CV-6596P, 2019 WL 2610793, at *6 (W.D.N.Y. June 26, 2019), *aff'd sub nom. Grega v. Saul*, 816 F. App'x 580 (2d Cir. 2020) (finding harmless error in ALJ's failure to explicitly discuss listings 12.07 or 12.08 as these listings "have the exact same paragraph B requirements as listings 12.04 and 12.06"); *see also Rodriguez*, 2020 WL 5803802, at *8. Therefore, remand is not warranted based on Plaintiff's argument that the ALJ erred in finding that she did not meet or equal the listings.

## 2. The ALJ's RFC

Plaintiff next contends that the ALJ erroneously rejected Dr. Broska's opinion that she was moderately limited in maintaining a schedule, which should have been incorporated into the RFC. (Docket No. 14 at 28-29). The Commissioner counters that the ALJ appropriately weighed this portion of Dr. Broska's opinion against countervailing evidence, including both the treatment notes showing improvement with treatment and mild findings, and Dr. Kerenyi's opinion that Plaintiff was not limited in this area. (Docket No. 22 at 23-24). The Court finds that the ALJ's rationale was proper and supported by substantial evidence.

As previously explained, an ALJ may decline to accept some conclusions of a medical opinion when they are inconsistent with the rest of the record, as long as the ALJ adequately explains the basis for this decision. *See Jackson*, 2018 WL 3306193, at *7. Such an explanation

is sufficient when the juxtaposition of the relevant medical opinions with the other medical evidence "makes apparent why the ALJ did not fully credit all of the limitations" in one opinion. *See Douglas*, 2019 WL 1017341, at *6.

The ALJ's decision presents an exhaustive review of Plaintiff's mental health treatment notes and consultative examinations, expressly recognizing her insomnia and "bouts of anxiety," but concluding from the record as a whole that her symptoms improved with therapy and medication. (R. 25-28.) The ALJ correctly noted that over time, Plaintiff reported sleeping better with her medication, as well as "coping better" and experiencing less mood swings and other symptoms such as panic attacks. (R. 26-27, 457, 599, 602, 691.) The ALJ also acknowledged that Plaintiff appeared more anxious at some appointments, but determined that these increased symptoms coincided with her partner's health problems or running out of medication, and amounted to only "occasional[] complaint[s]" in the context of the record as a whole. (R. 26.) Furthermore, Dr. Kerenyi found no limitations in maintaining an ordinary routine or regular attendance, (R. 569), and Dr. Harding identified no evidence of decompensation, (R. 114). For these reasons, the ALJ explained, the record did not support Dr. Broska's finding that Plaintiff was moderately limited in maintaining a schedule. (R. 27.) The ALJ further concluded that Plaintiff struggled to manage stress, but accounted for that limitation by restricting her to only occasional contact with others and proscribing assembly line work. (*Id.*).

Plaintiff argues that this conclusion is incorrect because she testified to having only "two good days a week" due to her anxiety and depression, and that she "sometimes" could not sleep through the night. (Docket No. 14 at 28.) The ALJ did not expressly address this testimony. However, as long as the ALJ considered the relevant evidence, he was not required to "reconcile explicitly every conflicting shred of medical testimony." *See Fiorello v. Heckler*, 725 F.2d 174,

48

176 (2d Cir. 1983).  In addition, it is not the Court's role to resolve conflicts in the evidence. *See Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002) ("Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, we will not substitute our judgment for that of the Commissioner.").  The ALJ discussed in detail Plaintiff's insomnia, panic attacks and difficulties managing stress, yet correctly found that the treatment notes consistently documented only an "anxious mood" and otherwise "mild signs" of her impairments, which coincided with Dr. Kerenyi and Dr. Harding's conclusions with regard to keeping a schedule. (R. 25, 27).[20]  Moreover, the third party function report, as well as Plaintiff's own statements, indicated that she shopped and participated in other activities of daily living regularly. (R. 27, 266, 569).  This was "ample evidence" to contradict Dr. Broska's opinion regarding Plaintiff's ability to maintain a schedule, even though the ALJ did not expressly acknowledge Plaintiff's testimony on this topic. *See, e.g.*, *Natashia R. v. Berryhill*, No. 3:17-CV-01266 (TWD), 2019 WL 1260049, at *6 (N.D.N.Y. Mar. 19, 2019) (finding that ALJ properly rejected consultative report finding moderate limitations in maintaining a schedule where Plaintiff complained of "panic attacks . . . several times a week" but state agency psychologist rejected such a limitation and Plaintiff testified to participating in activities of daily living on a regular basis); *Hamilton v. Astrue*, No. 12-CV-6291P, 2013 WL 5474210, at *5, 17 (W.D.N.Y. Sept. 30, 2013) (declining to remand based on consultative examiner's conclusion that plaintiff experienced "moderate schedule disruptions due to her migraines" where balance of evidence

---

[20] Although the ALJ did not discuss Plaintiff's assertion at one appointment that she was hospitalized for depression in 2011, (R. 375-76), which conflicts with Dr. Harding's analysis, (R. 114) any such error was harmless, as Plaintiff denied psychiatric hospitalizations on other occasions, (*e.g.*, R. 566), and there is no indication that she was hospitalized for psychiatric impairments during the relevant period. *See Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010).

contradicted this conclusion).  Accordingly, the ALJ properly accounted for this deviation from

Dr. Broska's findings.

### E.  The Vocational Expert's Testimony

Plaintiff also challenges the opinion rendered by the VE.  Plaintiff asserts that she could

not work as an Advertising Material Distributor given the confines of her RFC because based on

the Dictionary of Occupational Titles' ("D.O.T.") description of this position,[21] "[a] person who

is limited to only four hours of standing/walking and occasional interaction with the public could

not perform [in it]." (Docket No. 14 at 25).  Plaintiff further argues that because the D.O.T.

describes the position as requiring "light work," it also requires six hours of standing or walking.

(*Id.*).  The Commissioner responds that the D.O.T.'s description of this position is not

inconsistent with the VE's testimony or Plaintiff's RFC. (Docket No. 22 at 20-21).  The Court

agrees with the Commissioner that the ALJ was entitled to rely on the VE's opinion because it

did not conflict with the D.O.T., and the hypothetical facts upon which it was based are

supported by substantial evidence.

"An ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as

the facts of the hypothetical are based on substantial evidence . . . and accurately reflect the

limitations and capabilities of the claimant involved." *Calabrese v. Astrue*, 358 Fed. App'x 274,

276 (2d Cir. 2009) (citations omitted).  However, where VE testimony conflicts with the D.O.T.,

"the ALJ must reconcile the two." *See Saunders v. Saul*, No. 19-CV-0270L, 2020 WL 4208250,

at *2 (W.D.N.Y. July 22, 2020) (citing cases).

---

[21] According to the D.O.T., an advertising material distributor "[d]istributes advertising material, such as
merchandise samples, handbills, and coupons, from house to house, to business establishments, or to persons on
street, following oral instructions, street maps, or address lists. May be designated according to type of advertising
material distributed as Handbill Distributor (any industry); Pamphlet Distributor (any industry); Sample Distributor
(any industry)." *230.687-010 Advertising-Material Distributor*, Dictionary of Occupational Titles, 1991 WL
672162.

Here, contrary to Plaintiff's assertions, the D.O.T. does not require more than four hours of walking or standing for this position, or for light work in general. *Cf. 230.687-010 Advertising-Material Distributor*, 1991 WL 672162; *Appendix C – Components of the Definition Trailer*, Dictionary of Occupational Titles, 1991 WL 688702.  In fact, the description of the position is silent as to the requisite amount of these activities.  Furthermore, the position does "[n]ot" require "significant" contact with "people," which would include interaction with the public. *230.687-010 Advertising-Material Distributor*, 1991 WL 672162.  Accordingly, there is no conflict between the VE's testimony and the D.O.T. that would render reliance on the VE's opinion improper. *See Gonzalez v. Comm'r of Soc. Sec.*, No. 19-cv-06230, 2020 WL 4548031, at *5 (W.D.N.Y. Aug. 6, 2020) (finding no material error in precluding plaintiff from occasional interaction with others and assigning jobs requiring "[n]ot [s]ignificant" interaction with "[p]eople"); *Reisinger v. Comm'r of Soc. Sec.*, No. 7:16-CV-428 (ATB), 2017 WL 2198965, at *10 (N.D.N.Y. May 18, 2017) ("[W]hen the DOT does not specifically provide for a particular restriction, there is no 'actual conflict' between the VE's testimony and the DOT.").

Moreover, the facts on which several of the ALJ's hypotheticals were based are identical to the restrictions in the RFC, and accounted for Plaintiff's age, education and experience. (*Compare* R. 55-57 *with* R. 25).  The hypotheticals inquired whether a person with Plaintiff's background could find work despite being restricted to light exertional work with only four hours of standing and walking each day, no in tandem or assembly line work, only occasional stooping, kneeling, crouching and crawling, and only occasional interaction with coworkers, supervisors and the general public. (*Id.*).  As the Court has already determined that these restrictions are supported by substantial evidence, the ALJ's reliance on the VE's testimony was proper. *See Harry P. v. Saul*, No. 1:17-CV-1012 (LEK), 2019 WL 4689213, at *10 (N.D.N.Y. Sept. 26,

2019); *Blalock v. Berryhill*, No. 17-cv-6907 (RWL), 2018 WL 6332896, at *14 (S.D.N.Y. Nov. 8, 2018).

**F. Plaintiff's English Skills**

Plaintiff finally alleges that the ALJ erred in finding that she had the requisite English skills to find work in the national economy. (Docket No. 14 at 23-26).  According to Plaintiff, this conclusion was prejudicial because if the ALJ had found differently, he would have classified Plaintiff disabled based on (1) the level of English required for the two jobs the ALJ assigned; and (2) 20 C.F.R. Part 404, Subpart P, Appendix 2, Section 201.17 ("Rule 201.17"). (*Id.*).  Specifically, Plaintiff argues that according to the VE's testimony, she would not be able to find a job limited to four hours of standing and walking with the mental health parameters included in the RFC while being illiterate and unable to communicate in English. (Docket No. 14 at 25-26).  Plaintiff also argues that she is disabled under Section 201.17 because her previous work experience is unskilled, and she is between the age of forty-five and forty-nine, restricted to sedentary work, and either illiterate or unable to communicate in English. (*Id.* at 24-25).  The Commissioner argues that although Plaintiff may have interpreted the record differently than the ALJ, the ALJ's determination must be upheld because it is supported by substantial evidence. (Docket No. 22 at 18-19).  The Court agrees with the Commissioner, as Rule 201.17 is inapplicable given Plaintiff's capacity for light work, and there is sufficient evidence that Plaintiff had enough English language abilities to perform the advertising material position assigned by the ALJ.

As an initial matter, Plaintiff's Rule 201.17 argument fails because regardless of her English language abilities, the ALJ properly found Plaintiff capable of light work, which forecloses Rule 201.17's applicability to this case. *See Galarza v. Berryhill*, No. 3:18CV00126(SALM), 2019 WL 525291, at *14 (D. Conn. Feb. 11, 2019); *infra* Section

II.C.1.ii.b.  Rule 201.17 directs a finding of disability for individuals between the ages of forty-five and forty-nine who are limited to sedentary work, have unskilled or no previous work history, and who are either illiterate or unable to communicate in English. 20 C.F.R. Part 404, Subpart P, Appendix. 2, § 201.00(h)(1), Section 201.17.  In his decision, the ALJ found that Plaintiff was limited to light work and forty-six years old at the disability onset date, and that her previous work was unskilled. (R. 29).  A plaintiff limited to light work as opposed to sedentary work does not qualify as disabled under Rule 201.17. *See Galarza*, 2019 WL 525291, at *14. Because Plaintiff has not established that the ALJ erred in classifying her as capable of performing light work, Rule 201.17 is inapplicable. *See id.*; *see also Nunez v. Colvin*, No. 15 Civ. 4957 (CS)(PED), 2017 WL 684228, at *18 (S.D.N.Y. Feb. 21, 2017).

Furthermore, the ALJ did not err in finding that Plaintiff could work despite her limited English skills. *See Galarza*, 2019 WL 525291, at *14–17.  English language skills are evaluated as a vocational factor of education at step five of the sequential evaluation. *See Yulfo-Reyes v. Berryhill*, No. 3:17CV02015(SALM), 2018 WL 5840030, at *10 (D. Conn. Nov. 8, 2018). Literacy and communication are treated separately under the regulations. *See Id.* (citing 20 C.F.R. § 416.964 (2020)).[22]  Whereas "illiteracy" is defined as the "inability to read or write," the "inability to communicate in English is a separate educational factor that the SSA may consider." *See Afari v. Berryhill*, No. 16-CV-595-FPG, 2017 WL 1963583, at *3 (W.D.N.Y. May 12, 2017) (quoting 20 C.F.R. § 416.964(b)(1), (5)).  A person is classified as illiterate "if

---

[22] The Social Security Administration has updated its rules to remove "inability to communicate in English" as an education category for cases filed from April 27, 2020 forward. *See* Removing Inability To Communicate in English as an Education Category, 85 Fed. Reg. 10586-01 (Feb. 25, 2020).  However, "inability to communicate in English" remains the correct standard here, as the ALJ rendered his decision on October 16, 2018, (R. 21-34), and courts within this Circuit traditionally apply the version of the rules in effect "when the ALJ adjudicated [the subject] claim." *See Lowry v. Astrue*, 474 F. App'x 801, 804 n.2 (2d Cir. 2012) (summary order); *see also Estrada v. Comm'r of Soc. Sec.*, No. 18-cv-3530(KAM), 2020 WL 3430680, at *7 n.1 (E.D.N.Y. June 23, 2020).

the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name." 20 C.F.R. § 416.964(b)(1).  As to the ability to communicate in English, the regulations state: "Since the ability to speak, read and understand English is generally learned or increased at school, we may consider this an educational factor." *Id.* § 416.964(b)(5).

Here, the ALJ explicitly found that Plaintiff had a "limited education" but was "able to communicate in English,"[23] and therefore employable based on the VE's opinion. (R. 29-30).  In support of this finding, the ALJ concluded that Plaintiff had studied English, "reading and writing" until the ninth grade in Puerto Rico. (R. 29).  Plaintiff also selected boxes on her Disability Report indicating that she could both read and understand English, and write more than her name in English. (R. 29, 274).  Furthermore, she filled out a Function Report on her own, answering the questions in Spanish, which indicated that she could "read and understand the questions." (R. 29; 296-304).  At the hearing, the ALJ elicited testimony from the VE that if Plaintiff were "illiterate in English" and only able to communicate in Spanish, she would not be employable given the other parameters set by the RFC. (R. 58-59).  The VE further opined that a hypothetical individual in Plaintiff's position with Level 1 English language skills, equivalent to such skills at a first to third grade level, would be able to find work as a photocopying machine operator, advertising material distributor and marker, but not a routing clerk. (R. 59).  Based on this testimony, and because he had found that Plaintiff could "communicate in English," the ALJ

---

[23] The regulations define "limited education" as "a 7th grade through the 11th grade level of formal education," providing "ability in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs." 20 C.F.R. § 416.964(b)(3).

concluded that Plaintiff could work as a routing clerk and advertising material distributor despite the restrictions in the RFC. (R. 30).

Consistent with the D.O.T., the VE testified that a routing clerk requires English capabilities above Level 1,[24] (R. 59), *222.587-038 Router*, Dictionary of Occupational Titles, 1991 WL 672123, and the D.O.T. provides that an advertising material distributor requires Level 1 English skills, *230.687-010 Advertising-Material Distributor*, Dictionary of Occupational Titles, 1991 WL 672162.  Levels 1 and 2 both require a combination of reading, writing and speaking in English. *See* Appendix C – Components of the Definition Trailer, *Id.*, 1991 WL 688702.[25]  The VE further testified that Plaintiff could not work if she were deemed illiterate, but would be employable as an advertising material distributor if she had Level 1 English skills. (R.

---

[24] Each job description in the D.O.T. includes General Educational Development ("GED") levels rated between "1" and "6" pertaining to reasoning, mathematical and language development. *See* Appendix C–Components of the Definitional Trailer, Dictionary of Occupational Titles, 1991 WL 688702 (4th ed. 1991). The GED levels describe the general educational background that makes an individual suitable for a particular job. *Vandermark v. Colvin*, No. 3:13-cv-1467 (GLS/ESH), 2015 WL 1097391, at *9 n.19 (N.D.N.Y. Mar. 11, 2015).

[25] Level 2 involves:

> Reading: Passive vocabulary of 5,000-6,000 words. Read at rate of 190-215 words per minute. Read adventure stories and comic books, looking up unfamiliar words in dictionary for meaning, spelling, and pronunciation. Read instructions for assembling model cars and airplanes.

> Writing: Write compound and complex sentences, using cursive style, proper end punctuation, and employing adjectives and adverbs.

> Speaking: Speak clearly and distinctly with appropriate pauses and emphasis, correct punctuation, variations in word order, using present, perfect, and future tenses.

Similarly, Level 1 involves:

> Reading: Recognize meaning of 2,500 (two- or three-syllable) words. Read at rate of 95-120 words per minute. Compare similarities and differences between words and between series of numbers.

> Writing: Print simple sentences containing subject, verb, and object, and series of numbers, names, and addresses.

> Speaking: Speak simple sentences, using normal word order, and present and past tenses.

*Id.*

58-59).  Because the ALJ relied on this testimony to conclude that Plaintiff is employable, and Plaintiff does not challenge the sufficiency of the hypotheticals posed to the VE, the question for the Court is whether there is substantial evidence that Plaintiff had Level 1 English skills or above such that reliance on the VE' testimony was proper. *See McIntyre*, 758 F.3d at 151; *Ruiz v. Saul*, No. 18-CV-6404L, 2020 WL 57197, at *3 (W.D.N.Y. Jan. 3, 2020).

Plaintiff argues that the ALJ's analysis is flawed because his decision did not explicitly mention certain evidence calling into question her English language abilities. (Docket No. 14 at 23; R. 37, 39, 274).  Moreover, the ALJ incorrectly cited Exhibit C6E, opining that it further indicated Plaintiff's ability to "speak and understand English," when the cited portion of the form referred to a third party's English skills. (R. 29; 285).

The Court recognizes that Plaintiff's English may be rudimentary, but on this record, finds that there is enough evidence to support that Plaintiff had Level 1 language skills, the most basic of the GED levels. *See Brault*, 683 F.3d at 448 ("Under the substantial evidence standard, a reviewing court may reject an ALJ's findings of fact 'only if a reasonable factfinder would *have to conclude otherwise*.'") (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis in original).  An ALJ's decision is sufficient where, as here, it is clear from the ALJ's written determination that the ALJ considered conflicting evidence, but simply did not draw the conclusions that Plaintiff thinks he should have. *See Pulos v. Comm'r of Soc. Sec.*, 346 F. Supp. 3d 352, 360–62 (W.D.N.Y. 2018).  In addition, the standard for literacy is low and "the question is only whether the plaintiff is so deficient in his ability to read and write that he cannot obtain even an unskilled job." *Gross v. McMahon*, 473 F. Supp. 2d 384, 389 (W.D.N.Y. 2007) (quoting *Glenn v. Sec'y of Health and Human Servs.*, 814 F.2d 387, 391 (7th Cir. 1987)).

Although there is conflicting evidence regarding Plaintiff's English abilities, the ALJ's decision as a whole reflects that he weighed this evidence and simply did not agree with Plaintiff's contentions. *See Schaal*, 134 F.3d at 504 ("It is for the SSA, and not this court, to weigh the conflicting evidence in the record.").  The ALJ addressed Plaintiff's educational background and the fact that English is her second language, referencing her coursework in Puerto Rico up to the ninth grade. (R. 29).  Whereas he concluded that Plaintiff's education was "limited," he reasoned that Plaintiff could still find work because she affirmatively stated that she could write more than her name in English, as well as read and understand English, which was confirmed by her answers to the Function Report and the fact that she "passed" her English courses despite receiving poor grades. (R. 29, 39, 274, 296-304).  The ALJ also considered that Plaintiff answered the questions on the Function Report in Spanish – not in English – but determined that her responses reflected that she "was able to read and understand the questions." (R. 29).  Furthermore, the ALJ considered Plaintiff testimony that she last worked as a house cleaner, apparently without English communication issues, (*id.*), and numerous treatment notes cited earlier in the ALJ's decision indicate that Plaintiff was comfortable conducting her appointments in spoken English, (*e.g.*, R. 599, 620, 688, 741, 757).

These records constitute substantial evidence that Plaintiff could perform unskilled work at Language Level 1, despite her "limited education"[26] and "basic" English capabilities. (R. 29, 39).  Courts have found that claimants with a "limited education" who learned English as a second language like Plaintiff can perform unskilled work at Language Level 1 in light of similar

---

[26] The ALJ's conclusion that Plaintiff's education was "limited" is also supported by substantial evidence. *See Jimenez v. Berryhill*, No. 16-CV-3972, 2018 WL 4054876, at *6 (E.D.N.Y. Aug. 24, 2018) (finding that ALJ properly found claimant had "limited" education with fourth grade education, as he completed his own function report written in English and previously worked as a restaurant chef).

evidence. *See Ruiz*, 2020 WL 57197, at *2–3 (finding that claimant who completed eleventh grade in special education in Puerto Rico with limited reading and writing abilities could perform hand packager job); *Galarza*, 2019 WL 525291, at *15–17 & n.15 (finding employable a claimant with "limited education," who completed seventh grade and received GED in Puerto Rico, because record evidenced ability to read and write more than his name in English and he previously worked in jobs at Language Levels 1 and 2).[27]  The VE classified Plaintiff's house cleaning job as 323.687-014 in the D.O.T., (R. 41), which requires a Language Level of 1. *323.687-014 Housekeeping Cleaner*, Dictionary of Occupational Titles, 1991 WL 672783. Therefore, contrary to Plaintiff's assertions, the record "demonstrate[s] some facility with the English language" at Language Level 1 – including an ability to speak, read, follow simple instructions, and write more than her name in English – because the advertising material distributor position does not require a higher language level than Plaintiff's past work. *See Galarza*, 2019 WL 525291, at *17.

Because of this evidence supporting the ALJ's finding regarding Plaintiff's literacy and ability to communicate in English, his error in analyzing Exhibit C6E was harmless. *See Sepa v. Saul*, No. 19-CV-1658 (VEC), 2020 WL 4048668, at *2 (S.D.N.Y. July 20, 2020); *Anthony Joseph C. v. Comm'r of Soc. Sec.*, No. 5:18-CV-793 (ATB), 2019 WL 2995169, at *12 n.10 (N.D.N.Y. July 9, 2019) (finding that ALJ's misinterpretation of evidence was harmless error as substantial evidence still supported ALJ's decision).  Under these circumstances, and in light of the deferential substantial evidence standard, the Court must not substitute its judgment for the agency's. *See Cage*, 692 F.3d at 122.

---

[27] *See also Tran v. Comm'r of Soc. Sec.*, No. 1:15-CV-0559 (GTS)(WBC), 2016 WL 11477389, at *8 (N.D.N.Y. Aug. 25, 2016), *report and recommendation adopted sub nom. Tran v. Colvin*, 2016 WL 5408159 (N.D.N.Y. Sept. 28, 2016) (finding that claimant with "very limited ability to communicate in English" could perform work at Language Level 1); *920.587-018 Hand Packager*, Dictionary of Occupational Titles, 1991 WL 687916.

On this record, there is sufficient evidence to support a finding that Plaintiff could engage in the work recommended by the VE despite the fact that English is not her native language. Therefore, the Court finds that the ALJ's step five determination was supported by substantial evidence.

## III. CONCLUSION

For the foregoing reasons, the Court respectfully recommends denying the Plaintiff's motion for judgment on the pleadings and granting the Commissioner's cross-motion in its entirety.

## IV. NOTICE

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from receipt of this Report and Recommendation to serve and file written objections. *See* Fed. R. Civ. P. 6(a) and (d) (rules for computing time). A party may respond to another party's objections within fourteen (14) days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2). Objections and responses to objections, if any, shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Kenneth M. Karas at the United States District Court, Southern District of New York, 300 Quarropas Street, White Plains, New York, 10601, and to the chambers of the undersigned at said Courthouse.

Requests for extensions of time to file objections must be made to the Honorable Kenneth M. Karas and not to the undersigned.  Failure to file timely objections to this Report and Recommendation will result in a waiver of objections and will preclude later appellate review of any order of judgment that will be rendered. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(b), 6(d), 72(b); *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008).

Dated:  February 8, 2021
        White Plains, New York

                              **SO ORDERED:**

                              _____
                              JUDITH C. McCARTHY
                              United States Magistrate Judge